2023 IL App (1st) 210236-U

THIRD DIVISION
June 28, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

No. 1-21-0236

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | |
|---|---|
| ESTATE OF FRANK KURTZ, by JULIA KURTZ, INDEPENDENT ADMINISTRATOR; and JULIA KURTZ, INDIVIDUALLY, <br><br>    Plaintiffs, <br><br>    v. <br><br> ILLINOIS DEPARTMENT OF PUBLIC HEALTH, NIRAV SHAH, DIRECTOR; COUNCIL FOR JEWISH ELDERLY d/b/a LIEBERMAN CENTER FOR HEALTH AND REHABILITATION; and MICHAEL GOTTESMAN, EXECUTIVE DIRECTOR, <br><br>    Defendants-Appellees <br><br> (ESTATE OF FRANK KURTZ, by JULIA KURTZ, INDEPENDENT ADMINISTRATOR, <br><br>    Plaintiff-Appellant). | Appeal from <br> the Circuit Court <br> of Cook County <br><br><br> 2018-CH-07977 <br><br><br><br><br> Honorable <br> Celia G. Gamrath, <br> Judge Presiding |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

O R D E R

¶ 1    *Held*: Evidence of nonpayment for stay in long-term care facility supported Department of Health's approval of facility's notice of intent to involuntarily discharge resident; administrative hearing regarding nonpayment could proceed despite appeal of Medicaid penalty period, and hearing was not fundamentally unfair.

¶ 2      The Estate of Frank Kurtz appeals from a circuit court order upholding the determination of the Illinois Department of Public Health (DPH) that, because of nonpayment, Frank Kurtz could be involuntarily transferred or discharged from a long-term care facility, Lieberman Center for Health and Rehabilitation (Lieberman Center). Frank Kurtz's wife, Julia Kurtz, is also a party and has been involved in these proceedings as his representative. To avoid confusion between the two, we will depart from our convention of referring to individuals by their last names and respectfully use only their first names. The Estate argues that when evaluating Lieberman Center's notice of intent to transfer or discharge for nonpayment, the administrative law judge disregarded the finding of a different agency, Illinois Department of Human Services (DHS), that Frank made a resources spenddown that qualified him for Medicaid funding that would reduce his debt to the facility. The Estate also argues that the administrative law judge did not hold the facility to a federal regulation about involuntarily discharging Medicaid-pending residents, should have postponed the hearing while Frank appealed Medicaid penalties, and made other improper or unfair rulings. Lieberman Center responds that the appeal is moot due to Frank's death, or that the decision should be affirmed where the evidence established nonpayment, there was no evidence of the resources spenddown that would trigger Medicaid funding, and that all of the Estate's other arguments lack merit.

¶ 3      In its response brief, Lieberman Center asks us to strike the statement of facts section of the Estate's opening brief, as it is argumentative and incomplete rather than the required neutral recitation of facts necessary to understand the appeal. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020) (requiring an appellant's brief to provide a statement of facts that "contain[s] the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and

with appropriate reference to the pages of the record on appeal"). For example, in what is supposed to be an impartial history, the Estate states on pages 10 and 11 of its brief that the facility's attorney "challenged" and "blam[ed]" Julia and "pushed aggressively" toward hearing, and when the administrative law judge proceeded with the hearing as scheduled, the judge "accepted Lieberman [Center]'s demands" and "ignor[ed] Julia's plea[s]." Tellingly, these same non-neutral word choices reoccur on pages 21 and 22, in the Estate's argument. Additionally, the facts section goes beyond what the record supports and at times treats the Estate's contentions as if they were fact. As examples, the Estate states without any basis that the agency is tasked with "four primary areas of inquiry" (which is one of the Estate's arguments for reversal) and that it verified the Kurtzes "medical expenditures" to other healthcare providers (another argument for reversal). Moreover, the facts section recaps the entire hearing at issue in only five sentences and provides no account whatsoever of the evidence. Other instances of argumentative, incomplete, or unsupported statements are scattered throughout the Estate's statement of "facts." The Estate does not refute Lieberman Center's criticism of the brief. When a brief does not comply with the rules, we have inherent authority to strike the noncompliant material or even dismiss the appeal. *Hubert v. Consolidated Medical Laboratories,* 306 Ill. App. 3d 1118, 1120 (1999). The argumentative and incomplete brief is noncompliant, but not so misleading that it hinders our analysis of the issues, particularly when we have benefit of Lieberman Center's thorough and more diplomatic presentation. In our discretion, we are disregarding the Estate's improper statements rather than striking them or dismissing the Estate's appeal. *Haubner v. Abercrombie & Kent International, Inc.,* 351 Ill. App. 3d 112, 117 (2004).

¶ 4     Lieberman Center points out, and the Estate does not disagree, that a separate departure

from the rules occurs on pages 1 through 4 of the Estate's opening brief, in a section entitled, "Preliminary Statement and Nature of the Case." This entire section is counter to Rule 341(h)(2), which requires an "introductory paragraph" about the "nature of the action" and "the judgment appealed from"–not the multiple paragraphs that span four pages of the Estate's brief. Ill. S. Ct. R. 341(h)(2) (eff. Oct. 1, 2020). The rule offers the following illustration of a suitable introductory paragraph: "This action was brought to recover damages occasioned by the alleged negligence of the defendant in driving his automobile. The jury rendered a verdict for the plaintiff upon which the court entered the judgment from which this appeal is taken. No questions are raised on the pleadings." Ill. S. Ct. R. 341(h)(2) (eff. Oct. 1, 2020). We agree that the Estate has violated the rule, particularly when there is a sharp contrast between its introductory "paragraph" and the model paragraph. We cannot cull an introductory paragraph from the Estate's lengthy presentation. Accordingly, we are disregarding the first four numbered pages of the opening brief. *Haubner,* 351 Ill. App. 3d at 117.

¶ 5     Lieberman Center also argues we should dismiss the appeal as moot, because Frank's death means that vacating the agency's decision cannot give Frank a right to return to the long-term care facility or provide any other effective relief. An appeal will be dismissed as moot when it does not involve an actual controversy or the court cannot grant the petitioning party effectual relief. *Lakewood Nursing & Rehabilitation Center v. Department of Public Health*, 2015 IL App (3d) 140899, ¶ 17. Courts of review generally do not consider moot or abstract questions for lack of jurisdiction. *Lakewood Nursing*, 2015 IL App (3d) 140899, ¶ 17. The Estate counters that Lieberman Center is procedurally barred from arguing mootness, because it did not timely raise the argument in the circuit court or file a cross-appeal setting out issues other than the ones that

the Estate chose to present in its appeal. We find this unpersuasive, because the record on appeal discloses that Lieberman Center *did* ask the circuit court to consider whether the case was moot; and even if mootness was being raised for the first time on appeal, mootness is grounds for dismissing an appeal for lack of jurisdiction. See *Lakewood Nursing*, 2015 IL App (3d) 140899, ¶ 17. The Estate also argues, however, that the collateral consequences exception to mootness is applicable. There are three exceptions to the mootness doctrine: (1) the public interest exception; (2) the capable of repetition yet evading review exception; and (3) the collateral consequences exception. *In re Deborah S.,* 2015 IL App (1st) 123596, ¶ 18. The latter exception to mootness applies if a party could suffer some future adverse repercussion if the order on appeal were not reviewed. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 18. The collateral consequences exception is decided on a case-by-case basis. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 20.

¶ 6    In *In re Deborah S.,* 2015 IL App (1st) 123596, the collateral consequences exception was applied where the circuit court determined an individual was subject to involuntary commitment to a mental health facility for up to 90 days. The respondent appealed, conceding that her appeal was moot because the 90-day order had expired, but maintaining that the order was subject to an exception. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 19. The appellate court agreed, observing that the Illinois Vehicle Code allows the Secretary of State to deny the renewal or retention of a person's driver's license if there is good cause to believe that the person would not be able to operate a vehicle safely due to a mental disability. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 24 (citing 625 ILCS 5/6-103(5), (8) (West 2012)). However, the vehicle code mandates those consequences where a person has been adjudged to be afflicted with or suffering from a mental disability. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 24 (citing 625 ILCS 5/6-103(5), (8)

(West 2012)). In the respondent's case, "her ability to seek employment similar to that she has held in the past [which required a driver's license] would be negatively impacted by the involuntary admission order in a way that differs from the impact caused solely by her mental diagnosis. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 24. Accordingly, the collateral consequences exception was applicable and the court proceeded to address the substantive arguments of the appeal. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 24.

¶ 7 Lieberman Center has sued Frank and Julia for nonpayment for Frank's stay at Lieberman Center. Lieberman Center's multicount lawsuit was filed in the circuit court of Cook County's law division (Council for Jewish Elderly v. Estate of Frank Kurtz, No. 16-L-008894 (Cir. Ct. Cook County)) and it progressed to a final judgment, which is now on appeal. The law division matter and this administrative agency matter involve some of the same parties, and the Estate argues that they are litigating some of the same issues, particularly when the allegations in the law division matter include Frank's status as a Medicaid-approved individual, his spenddown requirement, and the entry of the administrative decision authorizing Frank's involuntary transfer or discharge due to nonpayment. Thus, the unreviewed administrative decision could be used to Lieberman Center's advantage in its separate law division claim and the Estate and Julia would suffer future adverse repercussions if the order on appeal were not reviewed. Accordingly, the collateral consequences exception does apply and we will address the appeal.

¶ 8 Frank, who was born in 1949, moved into Lieberman Center in Skokie, Illinois on September 13, 2013. He executed a contract with the facility which stated the terms of his residency, including a daily private payor rate. On September 22, 2014, the long-term care facility completed a form that was promulgated by DPH as of February 2013 for use when giving "Notice

of Involuntary Transfer or Discharge and Opportunity for Hearing for Nursing Home Residents." The preprinted portion of the notice form stated, "This facility seeks to transfer or discharge you pursuant to the regulations of the Health Care Financing Administration[1] for states and long-term care facilities, 42 C.F.R. 483.12 ('federal regulations')." The form continued, "As recorded in your clinical record in accordance with Section 483.12(a)(4) of the federal regulations, the reason for this proposed transfer or discharge is," and was followed by various possible reasons for a resident's involuntary transfer or discharge. The facility checked the box next to the reason, "you have failed, after reasonable and appropriate notice, to pay for your stay at this facility, 483.12(a)(2)(v)." Lieberman Center also filled in the portion of the form indicating where it intended to move Frank, which was to a facility in Glenview, Illinois on October 24, 2014.

¶ 9    Frank gave his wife, Julia, power of attorney. Within 10 days of the notice, she retained legal counsel and contested the notice by requesting a hearing before DPH. On December 30, 2014, Julia submitted Frank's application to DHS for medical assistance through the Medicaid program. The DPH proceedings regarding the notice were periodically continued for more than a year. On December 16, 2015, DHS denied Frank's Medicaid application, stating that his eligibility could not be determined due to his failure to provide necessary information. He sought reconsideration after providing additional documents. Another year passed. In September 2016, Frank's attorney withdrew and Julia began representing her husband in the DPH proceedings. During a prehearing conference that same month, the facility's attorney said that Frank owed

---

[1] The Health Care Financing Administration was a federal agency which has been renamed Centers for Medicare and Medicaid Services as it has "oversight of the Medicare program, the Federal portion of the Medicaid program, and related quality assurance activities." *Health Care Finance (sic) Administration*, Federal Register, https://www.federalregister.gov/agencies/health-care-finance-administration (last visited June 12, 2023).

Lieberman Center $228,893.

¶ 10 On February 24, 2017, DHS approved Frank's Medicaid application, but with two conditions, stating:

> "This is the decision made about your application for Medical Assistance dated 12/30/2014.
>
> APPROVED starting 09/2014.
>
> You are eligible for medical assistance. Starting 09/2014, you will owe the facility where you live $266,360.60 each month unless changes occur or you use other medical bills or receipts to reduce this amount (see attached calculations).
>
> You are eligible for medical assistance but because of a non-allowable transfer of resources, the state will not pay for long term care services *** for 11 months and 27 days. This is called a penalty period[.]"

¶ 11 The approval decision was accompanied by a "HFS Form 2500," "Nursing Home/Supportive Living Facility Calculation," dated February 24, 2017, which indicated in part that Frank's "Monthly Nursing Home Charges" were $10,350 and "Starting 09/2014, you have $266,360.60 available to apply toward the cost of your care at the facility where you are living. Healthcare and Family Services will pay any remaining cost up to its payment rate." The attached calculations showed that the $266,360.60 that Frank "owe[d] the [residential] facility" included, among other things, his "Cash and bank accounts" totaling almost $259,000. The record on appeal attributes the benefit penalty period to disallowed transfers of assets that were made prior to applying for Medicaid.

¶ 12 Throughout the remainder of 2017, the administrative law judge continued to hold

prehearing conferences with the parties. Julia reported receiving the Medicaid approval and said that an appeal was underway. She also reported that Lieberman Center had filed a civil suit regarding the nonpayment. We note that three years had passed since the facility notified Frank of its intent to transfer or discharge him for nonpayment. The facility's attorney reported that Frank's unpaid balance was increasing.

¶ 13    At the end of 2017, DHS generated three additional Form 2500s which have caused disagreement between the parties. Although each was dated December 1, 2017, the Form 2500s pertained to "1/2017," "2/2017," and "3/2017," respectively. Each of the three forms consisted of four pages and was numbered accordingly, that is, the first page of each was marked "Page 1 of 4," and so on until the last page of each was numbered "Page 4 of 4." Each form stated in part, "This notice informs you of the amount of your monthly resources or income available to apply toward your medical care costs." For January 2017, DHS calculated that Frank would make a resource spenddown of $266,360.60 (the same amount stated in the Medicaid approval letter issued nearly a year prior), and then in the ensuing months of February and March 2017, there would be a zero spenddown of resources.

¶ 14    At a prehearing conference on January 2, 2018, Julia reported receiving the Form 2500s from DHS, but she described them as one seven-page notice dated December 1, 2017, which indicated that the "spend down amount due is now zero" and so "[Frank] has no liability." She indicated she would send the new notice to the administrative law judge and the facility's attorney. She also stated that Medicaid had been awarded as of September 2014, the Kurtz family had paid for Frank's care in September and October 2014, and Medicaid had paid the facility for the months of November 2014 through December 2017. She also said that there would be "a final hearing at

the end of January/beginning of February on this issue." Accordingly, the administrative law judge set the matter for status at the end of February 2018.

¶ 15    Before that next status date, Julia sent the administrative law judge and the facility's attorney the Form 2500 for March 2017. Lieberman Center's attorney e-mailed in response and included the administrative law judge on the distribution list:

> "Thanks, Julia.
>
> Unfortunately, this document doesn't tell us anything we didn't already know and does not change the outstanding balance owed to the facility. This calculation presumes that Frank was spending down the $266,360.60 by paying the monthly charges billed by the facility. This can be seen by tracing back the previous months' calculations. I've attached the [three] HFS [Form] 2500s from January through March of 2017, as well as the initial HFS [Form] 2500 for September 2014 to illustrate. Simply put, Frank was not paying his bills throughout that time, pursuant to the spenddown requirement and that's why we're [still] pursuing this involuntary discharge. Furthermore, I expect Frank would continue to owe his monthly income, less any applicable deductions, to the facility after the spenddown was met."

¶ 16    Julia answered with a lengthy e-mail explaining why she believed "the involuntary discharge petition no longer applies." Essentially, she related that a DHS representative stated "during an impromptu hearing held by telephone" that Frank's spenddown requirement had been met and was no longer " 'on the table,' " and that Julia had submitted "more than $320,000 in medical bills and payments" for various other medical expenses (*i.e.*, not long-term care expenses) Frank incurred between 2009 and December 2017 that satisfied the spenddown amount.

¶ 17    Lieberman Center's attorney e-mailed in response that he was not "taking a position one way or the other" on whether Frank had incurred other healthcare expenses that could be credited toward the spenddown requirement, but that this was established by the Form 2500 Julia had tendered. Also, until the spenddown was met, Medicaid would not pay Lieberman Center for any of Frank's skilled nursing care, which meant that the facility's charges between November 2014 through March 2017 remained outstanding. The facility's attorney also reiterated from his earlier e-mail that after the spenddown was met, the facility was required to invoice Frank's monthly "personal income" or "total personal liability," which DHS had calculated to be $2077.96, and that Frank would need to pay that amount before Medicaid would pay his remaining monthly costs.

¶ 18    The parties continued to exchange e-mails, but they repeated their positions and were unable to reach a resolution.

¶ 19    At the next prehearing conference on February 23, 2018, Julia represented that in January 2018, she received a bill from Lieberman Center reflecting a zero balance due and that she was currently waiting for DHS to determine how much of Frank's monthly Social Security benefits were to be contributed towards his ongoing stay at the facility. The facility's attorney said he had not been informed of this recent development. Julia then offered to e-mail the zero-balance bill to the administrative law judge and the facility's attorney. The administrative law judge set the next prehearing conference date for March 23, 2018, but the facility's attorney subsequently asked that the parties reconvene as soon as possible because he had learned from his client that instead of a zero balance, Lieberman Center's invoice for Frank's care reflected no third-party payments and a continuing "significant outstanding balance." The attorney e-mailed the administrative law judge and Julia:

"While I agree that the invoice is misleading in this regard and I would prefer the facility did not structure the invoice that way, it does not change the fact that there is still a significant outstanding balance owed to the facility. I am working with [my client] to update the invoice to reflect all private pay charges that are required per Medicaid rules and the calculations specific to this case."

¶ 20 The administrative law judge gave the parties a choice between rescheduling to March 9 or 13, 2018, and wrote to Julia:

"As always, during the hearing, [Lieberman Center] will have the burden of proving that the ITD should be granted as a result of the nonpayment of the past incurred private pay amounts and/or failure to pay the personal portion that has been due and owing since March 2017. You, or your legal representative, if you choose to retain legal advice, will be charged [at the hearing] with showing that sufficient payments have been made to pay for the service[s] that have been rendered by the nursing facility. The only reason this did not occur this morning was based on your representation that you had an invoice from the facility showing a zero balance and Attorney Kelly's representation that he had not been provided with the same information. Attorney Kelly's post status conference e-mail has placed us back to the point I believed we were at prior to this morning['s] status conference."

¶ 21 The administrative law judge concluded her e-mail by emphasizing that the dispute could not remain at a stalemate:

"[A]n impasse has occurred and there is a need to move forward. Attorney Kelly has already indicated that he is available at 9:00 a.m. on Friday, 3/9 or Tues., 3/13 for a status

hearing. I will extend the courtesy of allowing you to pick one of the two dates by Monday, 2/26 for the next status hearing. If I do not hear from you; I will pick a date and will notify you of the same. Once the next status hearing is established, I will cancel the 3/23/18 date."

¶ 22    Julia replied that she had met the spenddown, only the penalty was at issue, and that she was awaiting another date in Frank's Medicaid penalty appeal.

¶ 23    The facility's attorney disagreed with her:

"[F]rom the information you and the facility have provided me, Medicaid will not pay for any dates of service until proof of payment of the private pay amounts is provided to DHS, establishing that the spenddown was met. We have received no indication from DHS that this was done and are required to bill the private pay amount until directed otherwise. As with before, I do not rule out the possibility that adjustments to the spenddown amount may be made, but given the information provided, Medicaid payments will not be coming to the facility unless and until something changes and we need to proceed on that basis."

¶ 24    After more e-mails, the administrative law judge set the next status (not a hearing) for March 13, 2018, which was the later of the two dates she had offered. At the status date, Julia reiterated that Frank's spenddown had been met, the only issue remaining in the Medicaid appeal were the penalties, a DHS hearing occurred on February 28, 2018, and no further dates were pending. The facility's attorney said that he was seeking verification from DHS that the spenddown had been met by the payment of other healthcare expenses. The administrative law judge recorded in her conference report and order, "The problem everyone is having, including DPH, is the fact that there has been no documentation received by DPH or [the facility's attorney] to substantiate what Mrs. Kurtz has said." Julia said she would try to get support from her DHS caseworker, and

the facility's attorney said that he would contact the analyst in the Office of the Inspector General within DHS that was involved with Julia's appeal. The administrative law judge continued the matter to March 29, 2018.

¶ 25     More e-mails ensued on March 14 and 15, 2018. The administrative law judge posed a question to the facility's attorney: "I would like to clarify something. We all agreed that the spenddown was met in March of 2017. I believe you said the facility has not been paid yet from Medicaid. Is this correct or did Medicaid start paying the facility after March 2017 when the spenddown was met?" The facility's attorney responded in part:

"It is my understanding that Medicaid will not begin payment to the facility until the facility shows that it received payment pursuant to the spenddown that was calculated. I'd like to clarify that we do not agree that the spenddown was actually met, but rather it was calculated by DHS that it should have been met in March 2017, had full payment been tendered to Lieberman Center up to that date. As of my most recent conversation with my client, I was informed that no Medicaid payment has been received because [payment from Frank was a prerequisite]."

¶ 26     On March 16, 2018, the administrative law judge amended the conference report and order she entered on March 13, 2018. Stating with regard to the Form 2500 that Julia was relying upon, "On or around January 23, 2018, [DPH] was provided a HFS 2500 form *** which indicated that the resident's spenddown had been met on/around March 2017 and the (*sic*) Healthcare and Family Services would pay the remaining cost of the resident's care at the facility up to its payment rate." Based on that information, the ALJ changed the March 29, 2018 status date to a formal prehearing date at which "a discovery schedule will be set and an evidentiary hearing date will be assigned."

¶ 27    The administrative law judge's conference report and order for March 29, 2018 indicated that the facility's attorney reported that Frank owed $427,371 from November 2014 through April 2018, the facility had asked DHS to verify the spenddown payment that was reflected in the December 1, 2017 Form 2500, and without that verification, the facility would not be paid by Medicaid. The attorney also said that no appeal was pending and that the facility was ready to proceed to hearing. Julia said she agreed that the spenddown had been met, but that she was still appealing the penalty issue, and about $27,000 in transferred funds were in dispute there. She said the facility's past due figure was incorrect, as only $215,000 remained after resources had been shifted or waived. The administrative law judge set the matter for an evidentiary hearing on May 3, 2018, to determine "whether the involuntary transfer or discharge is authorized for the reasons specified *** in the Notice of Involuntary Transfer or Discharge." Using bold typeface, the administrative law judge emphasized, "**Each party shall provide all other parties with a copy of any document that it may offer into evidence as well as a list containing the name and address of any witness who may be called to testify by the close of business April 12, 2018**."

¶ 28    Julia did not disclose any documents or witnesses or ask the administrative law judge to issue any subpoenas prior to the discovery cut off on April 12, 2018. On that date, the facility's attorney disclosed that its two witnesses would be Dr. Michael Gottesman, the facility's executive director, and Veronica Melecio, one of the facility's billing support specialists. The attorney also disclosed Frank's contract with the facility; the Medicaid approval letter and Form 2500 dated February 24, 2017; the three Form 2500s dated December 1, 2017 with regard to "01/2017," "02/2017" and "03/2017"; and the facility's bill dated March 28, 2018, itemizing the unpaid charges for Frank's care since November 1, 2014 and totaling $427,371.

¶ 29    On April 30, 2018, three days before the scheduled hearing, Julia filed a motion to continue. In a cover e-mail, she anticipated that the motion would be denied and asked that the attached exhibits be available to her at the hearing, that her witnesses include the facility's attorney and the two individuals disclosed by the facility, that her husband be excused from attending for health reasons, and that her friend be allowed to attend. The attached exhibits included various facility bills, notices from the facility's civil suit, and documents from the Medicaid proceedings. In the motion itself, which was 13 pages of double-spaced text, Julia sought a continuance on grounds that her appeal of the Medicaid penalties was still pending. She argued that until the penalty issue was resolved, Lieberman Center could not generate an accurate bill for her husband's stay at the long-term care facility, and thus the facility itself was unprepared for the hearing it had been seeking.

¶ 30    That same day, the facility's attorney sent an e-mail objecting to a continuance and Julia responded in support. The next day, May 1, 2018, the administrative law judge denied the continuance on grounds that, by departmental regulations, it was untimely, and because Julia did not disclose, as required by departmental regulations, when she learned that a continuance was needed and what steps she had taken to avoid one. The administrative law judge also sent an e-mail detailing the parameters of the hearing, including that because Julia had not met the discovery deadline, the hearing witnesses and documents would be limited to the ones disclosed by the facility, but Julia would have the opportunity for cross-examination; Julia would not be able to call the facility's attorney as a witness; Frank's presence was excused; and Julia's friend would be allowed to attend.

¶ 31    On May 3, 2018, the hearing proceeded as scheduled. The parties stipulated to the

admission of the facility's exhibits. They also stipulated that Frank was approved for Medicaid, but they did not stipulate about the spenddown or penalty. Julia stipulated that the Kurtzes made no payments to the facility since November 2014. The administrative law judge stated that the Illinois evidentiary and procedural rules were controlling, but that she would give Julia some leeway because she was not an attorney. The judge granted Julia's request that her motion for a continuance be made part of the record.

¶ 32    The first witness was the facility's executive director, Dr. Michael Gottesman, who testified about the facility's payment requirements and its contract with residents, including that Frank had not met his contractual payment obligations. Dr. Gottesman also testified that residents approved for Medicaid still have payment obligations because they are required to contribute their personal income and in some instances they are subject to a spenddown requirement or penalty. Dr. Gottesman also testified that Frank had not cured his outstanding balance after receiving the facility's notice of intent to transfer or discharge due to nonpayment. Julia cross-examined Dr. Gottesman about some of the contract terms, the dates on the contract, and whether the facility issued bills each month.

¶ 33    When Julia indicated she had her own questions, the administrative law judge reminded Julia that because of her noncompliance with the witness disclosure deadline, her questions should be limited to the scope of direct examination.

¶ 34    Veronica Melecio, who handled Medicaid billing for Lieberman Center, testified that Medicaid coverage approval did not necessarily mean that Medicaid benefits would be disbursed as of the person's eligibility date. She described the spenddown and penalty period concepts. Melecio stated that a spenddown requirement could be satisfied not only by paying the long-term

care facility, but also by paying other medical expenses, such as hospital bills. However, if those other payments were made, the facility and the resident would receive notice from DHS or HFS that other medical expenses had been credited toward the spenddown.

¶ 35    In Frank's particular case, he applied for Medicaid about a year after he was admitted as a resident, and he was approved for Medicaid effective September 2014, but with a spenddown requirement of $266,360.60 and a penalty period of 11 months and 27 days. Accordingly, the facility continued to bill Frank monthly as a "private pay" client, for his room and board. Frank, however, did not make any payments to the facility to meet the spenddown amount.

¶ 36    Melecio was next questioned about the three Form 2500s dated December 1, 2017. She testified that the forms contained calculations, including the facility's private pay rates and what the resident was supposed to pay to the facility, and that the resident's payments would result in a resource reduction amount that in turn reduced the spenddown amount. When HFS issued the Form 2500s, the agency had not verified that Frank was actually turning over any of his income to the facility or had met the spenddown requirement. The forms contained calculations only and they were not intended as verifications. Instead, when the facility received payment from a resident, the facility would document that fact to Medicaid, and then Medicaid would determine when to begin sending funds to the facility. Without that documentation, Medicaid would not pay Lieberman Center. Alternatively, if a resident satisfied their spenddown amount by paying other allowed expenses, that would show up on documentation that the facility received from Medicaid. In Frank's case, however, Lieberman Center's billing office had not received documentation that he had met the spenddown by paying those alternative types of expenses.

¶ 37    Melecio also testified that meeting the spenddown would not have eliminated Frank's

monthly payment obligation to the facility. Even if Frank "met his spenddown and the proof of the payment had been processed and approved and Medicaid was actually effective beginning March of 2017," Frank's monthly payment obligation to the facility would not reduce to zero. The Form 2500s indicated that he was supposed to pay the facility approximately $2000 per month after meeting the spenddown. Frank, however, had not made those ongoing payments to the facility.

¶ 38    Melecio also confirmed that the facility received no payments from Medicaid. The facility's bill dated March 28, 2018 reflected private pay charges dating back to November 2014, resulting in an outstanding balance of $427,371.

¶ 39    Julia cross-examined Melecio. Some of her questions, however, were general, hypothetical questions about billing practices, amending bills, payments from Medicaid, and the Form 2500s, rather than questions about Frank's particular case. Other questions were cumulative of the direct examination, asked and answered, or went beyond the scope of direct examination and the administrative law judge sustained objections from the facility's attorney. At various points, Melecio stated that she did not understand Julia's questions.

¶ 40    Julia said that one of the facility's bills that she wanted entered into evidence was dated after the disclosure deadline. The administrative law judge considered admitting the bill, as well as allowing the facility to admit its most recent bill which likewise was dated after the discovery deadline. After further discussion, the administrative law judge decided to adhere to the discovery schedule and not allow either party to submit their additional documents. This concluded the hearing.

¶ 41    On May 8, 2018, the administrative law judge issued her report and recommendation. She determined that the Kurtzes had not made any payments to the facility since November 2014 and

that Frank, who was still residing at Lieberman Center, had an outstanding balance through March 28, 2018 of $427,371. In addition, a letter from DHS and HFS indicated that Frank was approved for Medicaid as of September 2014, but he had not paid his portion of the $266,360 spenddown required by the agencies. Consequently, no Medicaid payments are being made to the facility and Frank had an outstanding balance. The Nursing Home Care Act, 210 ILCS 45/3-401(d) (West 2014), provides that a facility may involuntarily transfer or discharge a resident who has failed, after reasonable and appropriate notice, to pay (or to have paid under Medicare or Medicaid) for a stay at the facility. Under these circumstances, this facility was entitled to involuntarily transfer or discharge Frank for nonpayment. Based on these findings of fact and conclusions of law, the administrative law judge recommended that the Lieberman Center's notice of involuntary transfer or discharge be affirmed.

¶ 42    The administrative law judge's report and recommendation were forwarded to the department's director. Upon reviewing the record, on June 10, 2018, the director adopted the report and recommendation, determining that the facility would be allowed to involuntarily transfer or discharge Frank.

¶ 43    The facility, however, did not act on the director's order. On June 23, 2018, Frank was hospitalized in poor health and did not seek to return to the facility before his death on September 4, 2018.

¶ 44    On June 25, 2018 (during Frank's hospitalization), the Kurtzes sought administrative review in the circuit court, and filed an emergency motion to stay the director's decision. One of the exhibits to the emergency motion was a determination from DHS dated March 30, 2018, which reduced the amount that had been used to calculate the penalty period of 11 months and 27 days.

In July 2018, the facility opposed the motion to stay, arguing that good cause for a stay was lacking when Frank was not residing at the facility due to his hospitalization and because the director's decision was proper. The circuit court denied the stay.

¶ 45    In August and September 2018, DPH filed the administrative record in the circuit court, including an audio recording of the administrative hearing.

¶ 46    In October 2018, DPH moved to dismiss the appeal as moot due to Frank's death in September 2018 which precluded the court from granting effective relief. Julia opposed dismissal, arguing that the facility could use the contents of the administrative decision to the Kurtzes' disadvantage in the facility's separate civil action for nonpayment. Julia indicated she was seeking the probate court's formal appointment as the independent administrator of her husband's estate. The circuit court continued the motion to dismiss and directed Julia to amend the complaint. In April 2019, Julia filed an amended complaint indicating the plaintiffs were the estate, by its independent administrator, but also Julia, individually. That same month, April 2019, an attorney filed a "limited scope appearance," indicating that he would assist and advise Julia only in certain aspects. Following the conclusion of the circuit court case, that attorney withdrew and is not involved in this appeal.

¶ 47    In May 2019, DPH renewed its motion to dismiss for mootness and also observed that Julia, as an individual, lacked standing to oppose the director's decision approving Frank's involuntary discharge. In September 2019, after considering the parties' arguments, the circuit court determined that Julia lacked standing and dismissed her from the proceedings, but the court rejected the other arguments for dismissal. The circuit court was persuaded by Julia's argument that the collateral consequence exception to mootness should apply, as the facility might use the

director's decision "as a way to bolster its claims" in the separate civil action.

¶ 48    Accordingly, the parties next addressed the merits of the administrative decision, as well the Estate's additional arguments. The circuit court was unpersuaded by the Estate's arguments and in February 2021 affirmed the director's decision. The Estate initiated this appeal in March 2021 and the parties have spent nearly two years preparing their appellate briefs.

¶ 49    We are reviewing the decision of the department rather than the decision of the circuit court. *Khan v. Department of Healthcare & Family Services*, 2016 IL App (1st) 143908, ¶ 8. Under the Administrative Review Law, the scope of judicial review includes all questions of law and fact presented by the record before the court. 735 ILCS 5/3-110 (West 2000). *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). The review standard, which determines the degree of deference given to the agency's decision, depends on whether an issue presented for our consideration is a question of fact, a question of law, or a mixed question of fact and law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). The Estate presents three main issues.

¶ 50    The Estate's first appellate contention is that the DPH administrative law judge lacked authority to "overrule and disregard" a DHS determination that Frank satisfied his spenddown requirement by December 1, 2017. Despite the Estate's wording, it is arguing that the hearing evidence did not support the outcome. The issue of whether the evidence presented in the administrative hearing warranted the outcome is a mixed question of law and fact because it involves the application of the relevant statutory provisions to particular facts. *Gayan v. Illinois Department of Human Services*, 342 Ill. App. 3d 1035, 1039 (2003) (mixed question was presented when addressing agencies' determination that a resident of a long-term care facility was required

to spend down assets of a certain trust before receiving Medicaid coverage); *Senno v. Department of Healthcare & Family Services*, 2015 IL App (1st) 132837, ¶ 34 (quoting *Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation,* 2014 IL App (1st) 123319, ¶ 19 (a mixed question of law and fact is one in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard")).

¶ 51    We address mixed questions under the clearly erroneous standard. *Gayan*, 342 Ill. App. 3d at 1039 (courts review the department's application of Medicaid law to the facts for clear error); *Khan*, 2016 IL App (1st) 143908, ¶ 8. This standard of review is "between the manifest weight of the evidence standard and a *de novo* standard, so as to provide 'some deference' to the agency's decision." *AFM Messenger*, 198 Ill. 2d at 392 (quoting *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)). The clear error standard gives the agency deference, in acknowledgment of the agency's experience and expertise in resolving matters under its jurisdiction. *AFM Messenger Service*, 198 Ill. 2d at 394; *Abrahamson v. Illinois Department of Professional Regulation,* 153 Ill. 2d 76, 97-98 (1992) (explaining that a significant reason for giving substantial weight and deference to an agency's interpretation of an ambiguous statute is that "agencies can make informed judgments upon the issues, based on their experience and expertise"). Under the clear error standard, we will reverse only when we come to the definite and firm conviction that a mistake was made. *Cinkus*, 228 Ill. 2d at 211; *Hanks v. Department of Healthcare & Family Services*, 2015 IL App (1st) 132847, ¶ 19.

¶ 52    The Estate's contention that DHS reached a "final decision" (which DPH had no authority to "overrule") that Frank met his spenddown obligation is based to some extent on the three Form

2500s dated December 1, 2017 indicating that Frank would pay $266,360.60 from his resources by March 2017. These documents do not support the Estate's appeal. Billing specialist Melecio testified in numerous ways to the contrary. Melecio stated that the forms contained calculations of when the spenddown would be met and were not verification that any payments were actually made in satisfaction of the spenddown requirement. For example, during the facility's direct examination of Melecio, the following exchange occurred:

"Q. All right. Does H.F.S. verify that the income that's calculated in Section K ['Resource Reduction'] is actually being turned over to the facility when it issues these 2500 forms?

A. Can you ask that again?

Q. Yes. When H.F.S. first issues this, this form, *** has it actually verified that any of that income has been turned over to the facility?

A. No.

Q. Okay. And does, when H.F.S. issues this form, does it verify, has it already verified that any of the private pay charges that are calculated into this reduction has been paid to the facility?

* * *

A. [No, it's] not saying, stating that he has actually reached the spenddown. There is no verification for that.

Q. Okay. So[,] there's no verification that any of these reductions have actually been received by the facility?

A. Yes.

Q. Okay. So[,] if that's the case, then how does Medicaid determine when to be, when to begin releasing payments to the facility? How do they know?

A. Medicaid would know once I give them documentation stating that we received payment and that the resident actually met the spenddown.

Q. Okay. So[,] what if the resident hasn't done that?

A. Then we will not receive payment from Medicaid."

¶ 53    Later, she was asked whether Lieberman Center had received any documents that suggested Frank met his spenddown requirement by "us[ing] his funds on other allowable expenses," outside of Lieberman Center, Melecio answered, "No." During cross-examination Melecio testified that Line B(4) on the Form 2500s, which is entitled "Allowable Medical Expenses (incurred up to 6 months prior)," would have been the place to enter medical expenses from other sources. On the three forms in the record on appeal, Line B(4) was left blank and no reductions for medical expenses are indicated anywhere on the forms. Melecio was also asked during cross-examination, "And so is it your understanding when you see that form [for March 2017] that the spenddown has been met when you see this form?," Melecio responded, "No." Another question posed to Melecio was, "If *** you had received confirmation that the spenddown had been met *** if you had received that verification, would you have started billing him back for March, from March 2017?," to which Melecio responded, "I did not receive the verification."

¶ 54    The Estate argues that Melecio's testimony is contradicted by documents which the Estate has attached to its appellate reply brief. This is Julia or the Estate's latest inappropriate attempt to avoid the discovery deadline set by the administrative law judge five years ago when she ordered on March 29, 2018: "**Each party shall provide all other parties with a copy of any document**

**that it may offer into evidence \*\*\* by the close of business April 12, 2018.**" (Emphasis in original.) Julia missed the disclosure deadline entirely, sought to avoid the consequences by seeking a continuance three days before the hearing and attaching her discovery documents to her motion, failed to disclose why she had not timely sought a continuance, and argued at the hearing that certain documents, nevertheless, should be admitted. Furthermore, the first document the Estate now relies upon bears the date "06/08/20," and, thus, seems to have been generated well after the administrative proceedings that we have been asked to review for error; the second document is an excerpt from a deposition that was taken on October 26, 2020 in a separate administrative proceeding (not the administrative proceeding on appeal); and the third document is an affidavit dated August 18, 2022. These documents are not properly before this court. *Cannici v. Village of Melrose Park*, 2019 IL App (1st) 181422, ¶ 36 (courts cannot consider evidence outside of the record of the administrative appeal); 735 ILCS 5/3-110 (West 2016) (in an administrative review case, "No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court"). Even so, the Estate argues, "These facts should have been disclosed to the [administrative hearing judge] in the hearing, but they were not," and that they would have precluded the administrative law judge from ruling in favor of Lieberman Center. These new documents do not undermine Melecio's testimony or support the Estate's argument regarding the three Form 2500s dated December 1, 2017.

¶ 55    In addition to the Form 2500s, the Estate cites a DHS administrative law judge's ruling dated March 30, 2018, about the propriety of a penalty period of ineligibility for financial assistance for nearly one year, between September 1, 2014 and August 27, 2015, "because [Frank]

transferred assets for less than fair market value (FMV) in the 5 years preceding the application date." The Estate contends that the DHS judge also "found that Frank Kurtz's resource spenddown had been met," and yet the DPH judge subsequently usurped the authority of DHS to make Medicaid determinations and "overruled and disregarded" the finding. We cannot consider the DHS order and additional documents that the Estate cites because none of them was tendered at the administrative hearing, and one of them even postdates the hearing. *Cannici*, 2019 IL App (1st) 181422, ¶ 36; 735 ILCS 5/3-110 (West 2016).

¶ 56    The Estate attacks the administrative law judge's finding that Frank failed to pay the spenddown and contends that the judge "substituted her own personal interpretation" of the Form 2500s for that of the Medicaid-providing agencies. But the administrative law judge's report and recommendation to the DPH director reflected what the hearing evidence showed: the forms contained calculations of the spenddown that was anticipated over time; and did not reflect that Frank satisfied Medicaid's spenddown obligation by actually paying Lieberman Center's charges or reducing the amount that he owed directly to the facility by actually paying expenses incurred with some other healthcare provider(s). According to the hearing record, the facility's claim was for November 2014 to April 2018, Julia stipulated to making no payments since November 2014, and Melecio testified that Lieberman Center had received no payments since November 2014. Melecio also testified that the Form 2500s were not verifications of spenddown payments to the facility or another provider. Melecio testified that if her employer received spenddown payments, she would have relayed this information to the agencies, and that if Frank made spenddown payments to other providers, the agencies would have relayed this information to Lieberman Center. We also note that Form 2500 is entitled "Nursing Home/Supportive Living Facility

*Calculation*" (emphasis added), rather than "spenddown *verification*." Nevertheless, throughout the years of payment demands, Julia cited the Form 2500s as spenddown verification. On one occasion, she cited to Lieberman Center its own supposed zero-balance invoice in January 2018 as evidence that the spenddown was met, but this was simply not borne out by the facility's records and Julia did not cite this invoice again in the subsequent pre-hearing conferences. In addition, even if the spenddown had been satisfied, it is undisputed that Frank never began tendering the monthly Social Security benefits that are itemized on the Form 2500s and, thus, disregarded the agency's calculations and did not pay the facility his share of his costs so as to trigger Medicaid payments for the remaining balance.

¶ 57    Both federal law and the Illinois Nursing Home Care Act provide limited and similar reasons that a facility may involuntarily discharge a resident, such as concerns for health or safety. Nonpayment for services was a permissible reason for a facility to involuntarily transfer or discharge a resident under the federal regulation that was cited in the form which Lieberman Center used to notify Frank of its intent in the fall of 2014, 42 C.F.R. § 483.12(a)(2)(v), which was in effect April 18, 2013 through November 27, 2016). It stated:

"(2) "Transfer and discharge requirements. The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless

* * *

(v) The resident has failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at the facility." 42 C.F.R. §483.12(a)(2)(v) (2014).

¶ 58    Illinois law similarly provided:

"A facility may involuntarily transfer or discharge a resident only for one or more of the following reasons:

(a) for medical reasons;

(b) for the resident's physical safety;

(c) for the physical safety of other residents, the facility staff or facility visitors; or

(d) for either late payment or nonpayment for the resident's stay[.]" 210 ILCS 45/3-401 (West 2000).

¶ 59    Thus, the director's decision that Frank could be discharged for nonpayment was well-supported by both the facts and the law. We are not left with a definite and firm conviction that a mistake was made by the administrative agency.

¶ 60    Also lacking merit is the Estate's second main contention, that the federal regulation we quoted above and which Lieberman Center cited in its notice regarding nonpayment, 42 C.F.R. § 483.12(a)(2)(v) (2014), was updated as 42 C.F.R. § 483.15(c)(1)(i)(E) (2018) prior to the administrative hearing and required the administrative law judge to make certain findings which she failed to make. Language added to the prior statute is underlined below:

"(c) Transfer and discharge–

(1) Facility requirements–

(i) The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless–

* * *

(E) The resident has failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at the facility. Non-payment applies

if the resident does not submit the necessary paperwork for third party payment or after the third party, including Medicare or Medicaid, denies the claim and the resident refuses to pay for his or her stay." 42 C.F.R. § 483.15(c)(1)(i)(E) (2018).

¶ 61 The administrative law judge's recommendation referred to the recodified regulation but did not expressly address which version of the regulation applied. Given the similarity in the two regulations, we see no reason for the administrative law judge to specify. Nevertheless, the Estate contends that the prior statute was "ambiguous" and "confusing," so it was "materially changed" to "a stricter set of rules and procedures" requiring the administrative law judge to make four elements-based findings. Specifically, the Estate argues that the new regulation required the administrative law judge to ensure that (1) Frank submitted "the necessary paperwork" for Medicaid long-term care benefits, (2) Lieberman Center submitted a claim for payment from Medicaid, (3) Medicaid denied Lieberman Center's claim, and 4) Lieberman Center next billed Frank for its "unpaid services" and Frank refused to pay the facility's "final bill." According to the Estate, the administrative decision should be vacated because the judge "never articulated or addressed the facts needed to meet the protections provided under the new regulation."

¶ 62 Where there is "a dispute as to whether the governing legal provisions were interpreted correctly by an administrative agency, the case presents a purely legal question for which our review is *de novo.*" *CBS Outdoor, Inc. v. Department of Transportation*, 2012 IL App (1st) 111387, ¶ 26; *Palm v. Holocker*, 2018 IL 123152, ¶ 21 (the *de novo* standard applies in instances of statutory construction). The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. *Palm*, 2018 IL 123152, ¶ 21. The most reliable indicator of that intent is found in the legislature's language, giving those words their plain and ordinary meaning. *Palm*,

2018 IL 123152, ¶ 21. Clear and unambiguous language is to be given effect without resort to other aids of construction. *Palm*, 2018 IL 123152, ¶ 21. Statutes must be construed in a manner which "avoid[s] absurd, unreasonable, or unjust results that the legislature could not have intended." *Palm*, 2018 IL 123152, ¶ 21.

¶ 63 We will assume for purposes of argument that a regulation adopted after Lieberman Center issued its notice and Frank sought administrative hearing was applicable to the hearing. Nothing in the regulation supports the contention that a material change occurred, or that the decision was supposed to include any particular elements or specific findings, let alone the four-step process the Estate has authored. The section's continued focus on whether payment has occurred does not suggest a markedly different approach.

¶ 64 Although the Estate cites a federal register entry, it is a 185-page PDF document which shows that the revision to the statute at issue was only a small change in a comprehensive regulatory update, most of which focused on and made greater amendments to other matters involving long-term care facilities that participate in federal medical assistance programs. The Federal Register entry begins with the following "SUMMARY"

> "This final rule will revise the requirements that Long-Term Care facilities must meet to participate in the Medicare and Medicaid programs. These changes are necessary to reflect the substantial advances that have been made over the past several years in the theory and practice of service delivery and safety. These revisions are also an integral part of our efforts to achieve broad-based improvements both in the quality of health care furnished through federal programs, and in patient safety, while at the same time *reducing procedural burdens on providers*." Emphasis added. *Medicare and Medicaid Programs;*

*Reform for Requirements for Long-Term Care Facilities*, 81 Fed. Reg. 68688, https://www.federalregister.gov/documents/2016/10/04/2016-23503/medicare-and-medicaid-programs-reform-of-requirements-for-long-term-care-facilities (last visited June 12, 2023).

¶ 65    The entry also contains an "Executive Summary" which explains that the various regulations "have not been comprehensively reviewed and updated since 1991 [citation], despite substantial changes in service delivery in this setting." Medicare and Medicaid Programs; Reform for Requirements for Long-Term Care Facilities, 81 Fed. Reg. 68688, (https://www.federalregister.gov/documents/2016/10/04/2016-23503/medicare-and-medicaid-programs-reform-of-requirements-for-long-term-care-facilities, last visited June 12, 2023). Section 483.15(c)(1)(i)(E) is not identified in the summary of significant amendments.

¶ 66    Nevertheless, the Estate expects us to conclude that the prior regulation was ambiguous, in need of "greater precision" in the criteria for involuntary transfer or discharge due to non-payment, and that the new version contains the four elements the Estate has devised. We are not persuaded that "[t]he regulations specifically prescribe a course of action for the [long-term care] facility and do not involve an element of judgment or choice." The Estate's four elements are unreasonable and would impose empty formalities on the long-term care facility. As the Estate would have it, an involuntary discharge could not be approved by DPH without specific evidence that a claim was submitted to Medicaid and "denie[d]," regardless of Medicaid's payment practices, which costs Medicaid would or would not cover for a particular client, or what conditions were imposed on the client to trigger Medicaid payment. Even if the resident's Medicaid application was successful, but the benefits were insufficient, the facility would need to knowingly submit

ineligible bills for government payment in order to obtain evidence that a claim was "denie[d]." The Estate's proposed reading also requires a subsequent renewed payment demand to the resident, regardless of the circumstances under which payment was previously sought and was not forthcoming. Nothing in the statute's language suggests that federal regulators intended to promote improper billing or empty procedural burdens. The Estate's reading is implausible. See *Palm*, 2018 IL 123152, ¶ 21 (courts construe statutes in order to avoid absurd, unreasonable, or unjust results that were not intended by the legislature).

¶ 67    A statute should be read as a whole, rather than as isolated words or phrases, and construed so as to give effect to every word, clause, and sentence. *Palm*, 2018 IL 123152, ¶ 21. The retention of the first full sentence indicates that the focus of the statute continues to be on whether the resident has failed to pay for, or have Medicare or Medicaid pay for, the stay at the long-term care facility. The addition of the sentence regarding non-payment and the resident's submission of "the necessary paperwork for third party payment" clarifies that the concept of nonpayment must allow the resident to seek payment through Medicare or Medicaid. The last clause regarding the third-party's denial of the claim is not relevant here.

¶ 68    The evidence presented at the administrative hearing satisfied section 483.15(c)(1)(i)(E), to the extent that the new regulation applied. The evidence showed that Frank's application for Medicaid was approved, with conditions, including a resources spenddown, but the spenddown amount was neither submitted to Lieberman Center nor reduced by other payment(s). The evidence included billing specialist Melecio's testimony that under those circumstances, Medicaid payments would not be forthcoming. Melecio indicated that Lieberman Center could not inform Medicaid that it had received the spenddown amount directly from Frank and Lieberman Center

did not receive verification from the agencies that Frank had tendered the spenddown to some other provider(s). In addition, Julia testified that, at the time of the hearing in 2018, the Kurtzes had not paid any money to the facility since November 2014. Based on this evidence, the director properly allowed Lieberman Center to proceed with Frank's involuntary transfer or discharge. Nothing about the revision to the federal regulation required otherwise.

¶ 69    The Estate contends that its remaining arguments concern due process. The Estate argues that the administrative law judge erred by conducting a hearing without waiting for final resolution of Frank's Medicaid penalty period, failing to uphold the principle of substantial justice, denying a request for a continuance, and adhering to a discovery deadline. Although the Estate characterizes these as due process violations subject to *de novo* review, they essentially concern the administrative law judge's rulings about how the hearing would be conducted and are reviewed for an abuse of discretion. *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003) (administrative agency's decision regarding the conduct of its hearing and the introduction of evidence is properly governed by an abuse of discretion standard and subject to reversal only if there is demonstrable prejudice to the party); *In re D.T.,* 212 Ill. 2d 347, 356 (2007) (the abuse of discretion standard is "traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial" such as by controlling discovery or allowing or excluding certain evidence); *Desai v. Metropolitan Sanitary District of Greater Chicago*, 125 Ill. App. 3d 1031, 1033 (1984) (an administrative body has broad discretion in conducting its hearings). The abuse of discretion standard is the most deferential standard of review available. *In re D.T.*, 212 Ill. 2d at 356. An abuse of discretion occurs when the agency's decision was arbitrary or capricious, or unless no reasonable person would agree with the

[agency's] position." *Windsor Clothing Store v. Castro,* 2015 IL App (1st) 142999, ¶ 48.

¶ 70    Contrary to the Estate's contention, the administrative law judge's decision not to delay the nonpayment hearing until final resolution of Frank's Medicaid appeal regarding the penalty period did not deprive Frank of due process. To recap regarding Frank's Medicaid status, he was initially approved with a resources spenddown requirement and also, due to disallowed transfers of approximately $123,120, a penalty period of nearly 12 months was imposed. When the facility's notice of involuntary transfer or discharge for nonpayment was heard, Frank had completed his appeal of the spenddown figure, fixing it at $266,361, but he had not submitted that amount to Lieberman Center or obtained verification of otherwise satisfying the spenddown amount. According to the DHS administrative law judge's decision on March 30, 2018, the value of the disallowed asset transfers was $123,120 which DHS stipulated it would reduce to $27,000. Because the value of disallowed assets is converted into a penalty period, the reduction in disallowed asset transfers would reduce the length of Frank's penalty period. The DHS administrative law judge, however, was not tasked with examining the spenddown requirement. The Estate subsequently sought judicial review, and the circuit court found in March 2021 that the remaining transfers were not properly disallowed, and thus, the penalty period was entirely eliminated. However, the length of the penalty period or even the existence of a penalty period was unrelated to the spenddown requirement and did not affect the fact that Frank was subject to the spenddown requirement and had not satisfied it.

¶ 71    The statutes and regulations that the Estate cites do not support its contention that the administrative law judge violated Frank's right to due process by proceeding to hearing on the issue of nonpayment in 2018 while the separate issue of a penalty period was yet to be finalized

until 2021. Federal law states that a nursing facility may not involuntarily transfer or discharge a resident during the time that they are appealing to the department from the facility's notice of intent to involuntarily transfer or discharge the person. 42 C.F.R. § 483.15(c)(1)(ii) (2017) (stating transfer and discharge rights, and that, generally, the facility may not transfer or discharge the resident "while the appeal is pending"). See also 42 C.F.R. § 431.230 (2013) (stating with regard to medical assistance programs, that when the agency sends a 5-day or 10-day notice, and the beneficiary requests a hearing within that timeframe, the agency may not terminate or reduce services until a decision is rendered after a hearing, with limited exceptions); 42 C.F.R. § 431.220(a)(3) (2017) (stating with regard to medical assistance programs, when a State agency must grant a hearing). These regulations do not support the Estate's contention that federal law prevents a nursing facility from involuntarily transferring or discharging a resident while any Medicaid appeal is pending.

¶ 72    The Estate also cites section 3-406 of the Care Act, which provides that when the basis for an involuntary transfer or discharge is the result of an action by HFS regarding a Medicaid recipient, and a hearing request is filed with HFS, then the 21-day period for initiating the involuntary transfer or discharge does not begin until HFS or a court of competent jurisdiction renders its final decision in the matter, and notice of the decision is received by the resident and the facility. 210 ILCS 45/3-406 (West 2020). It is unclear that the State law applies here where the basis for Lieberman Center's notice of involuntary transfer or discharge was section 483.12(a)(2)(v) of the federal regulations, and not the State act. Nevertheless, the HFS decision in February 2017 established the general parameters of Frank's Medicaid assistance, approving it effective September 2014, setting the spenddown amount and penalty period. Nothing in section

3-406 provides that a hearing on a facility's intent to transfer or discharge for nonpayment must be delayed to await a decision on a Medicaid-related matter (a penalty period) that would neither result in, nor cure, the nonpayment status.

¶ 73    Even if the Estate's contentions were supported by the statutes, that would not resolve the question of due process because "[m]inimum procedural requirements are a matter of federal constitutional law, and the process due in a given situation is not controlled by state statutory provisions." *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 205 (2009). The Estate contends that instead of being an "inconsequential or tangential issue," the penalty period could affect the timing of Medicaid assistance as well as the amount of assistance that was ultimately available for Frank's stay at Lieberman Center. But even if that were correct, Frank's spenddown debt to the facility would not be eliminated by any determination of the penalty period. The payment deficiencies shown by the hearing evidence remained, in that Frank had not paid the facility any amount in years, he had not paid his spenddown to the facility to trigger any Medicaid assistance, and there was no evidence that he had satisfied the spenddown some other way and reduced his debt to Lieberman Center. Moreover, even with no penalties, and even assuming that the spenddown was met by paying another provider, Frank had a continuing obligation to Lieberman Center to contribute his income of about $2000 during his unpaid stay. Under those circumstances, the administrative law judge did not deny Frank due process by declining to further delay the hearing to await the outcome of Frank's appeal of the penalty period.

¶ 74    The Estate contends that substantial justice was not done because Julia was disadvantaged as "a self-represented litigant." The Estate contends that a "fundamentally unfair proceeding *** merits correction by the courts" and cites generally to *Strickland v. Washington*, 466 U.S. 668

(1984) (*habeas corpus* decision establishing when a criminal defendant's right to counsel is violated by counsel's ineffective performance). The hearing transcript indicates that the administrative law judge tried to give Julia "a little latitude" as a non-attorney and did not hold her to the same standards applied to the facility's attorney. Furthermore, "administrative procedure is simpler, less formal and less technical than judicial procedure." *Desai*, 125 Ill. App. 3d at 1033. But *pro se* litigants are presumed to know the applicable rules and procedures and must comply with them as would be required of an attorney. See *JPMorgan Chase Bank, National Association v. Jones*, 2019 IL App (1st) 181909, ¶ 29; *In re Estate of Pellico*, 394 Ill. App. 3d 1052, 1067 (2009) ("the fact that Gregory was not represented by counsel when he appeared before the circuit court and filed a responsive pleading does not affect his waiver of any objection to personal jurisdiction"). We do not agree with the Estate's contention that the proceeding, when viewed in totality, was fundamentally unfair.

¶ 75 The Estate also takes issue with the administrative law judge's denial of a continuance, contending that good cause was shown by the fact that there was an ongoing appeal of the penalty period determination and that Julia filed the motion on Monday, April 30, 2018 "four days prior to the hearing" on Thursday, May 3, 2018. The department counters that this was only three days before the scheduled hearing.

¶ 76 Regardless of whether it was three or four days in advance, as the judge discussed in her order denying the continuance, under the department's procedures, a motion for a continuance shall be granted only for good cause shown, filed at least five working days prior to the hearing, and made immediately when the requesting party becomes aware that a continuance is needed. 77 Ill. Admin. Code § 100.8(e) (2014) (stating practice and procedure in DPH administrative

hearings). The procedural code also states that the motion must indicate when the party learned of the need for a continuance, the steps that were taken to avoid seeking one, and the current reasons supporting a continuance. 77 Ill. Admin. Code § 100.8(e) (2014).

¶ 77     Julia's motion for a continuance spanned 13 pages of single-spaced text and was accompanied by various exhibits, but it did not satisfy either of these requirements. The hearing was scheduled on March 29, 2018, to occur 35 days later on May 3, 2018, but Julia filed her motion 32 days later and three days before the hearing. The motion was untimely. Despite its length, it did not contain any argument that required the administrative law judge to delay the hearing. In claiming that "good cause" was shown, the Estate reiterates that the Medicaid appeal of the penalty had not reached its final resolution. However, as we discussed above, the administrative law judge was not required to delay the hearing for that reason. The record does not indicate that the decision was arbitrary, capricious, or that no reasonable person would agree with the decision. Denying the continuance was not an abuse of discretion.

¶ 78     The Estate also contends that the administrative law judge refused to admit "new" evidence at the hearing that would have materially affected the outcome. The Estate's "new" evidence consisted of three bills from Lieberman Center dated February through April 2018, respectively, and the DHS decision entered by the (other) administrative law judge on March 30, 2018 regarding the Medicaid penalty period. The Estate argues that the DPH administrative law judge "made a deliberate decision to exclude evidence that would contradict her findings, thereby *** enabling her to conclude that Frank still owed his Medicaid spenddown to the facility." To the extent that the Estate is suggesting that the administrative law judge had improper motives, there is no basis for such a vilifying suggestion and the record shows that no abuse of discretion occurred.

¶ 79    The department's regulations require that a party disclose its hearing documents and witnesses "at least 21 days prior." 77 Ill. Admin. Code § 100.12(b), (c) (2014). That timeline may be adjusted upon a showing of "good cause," which occurs when the party "through no fault of its own, did not have knowledge of a document to be offered into evidence or the name of a witness within the timeframe necessary for compliance with Section 100.12(b) and (c), and provided notice of the evidence or witness to the opposing party as soon as possible after learning about the existence of the evidence or witness." 77 Ill. Admin. Code § 100.13(n) (2014).

¶ 80    The record shows that the March 29, 2018 pre-hearing order expressly informed Julia of the April 12, 2018 deadline for disclosing documents and witnesses that she intended to present at the hearing, and that the administrative law judge even used boldface font to draw the parties' attention to the discovery deadline. Julia did not make any disclosures within the deadline. Instead, she first asked to submit documents in her cover e-mail for her untimely continuance motion, just three days before the hearing. The administrative law judge was not required to excuse Julia's noncompliance with the procedural rule and expand the scope of the imminent hearing merely because Julia was not an attorney. See *JPMorgan Chase Bank*, 2019 IL App (1st) 181909, ¶ 29; *In re Estate of Pellico*, 394 Ill. App. 3d at 1067. Furthermore, only one of the three sequential monthly bills was dated after the discovery deadline (it was issued on the deadline, April 12, 2018) and thus Julia's exhibits were not "new" and were known to her prior to the discovery cutoff. Despite the Estate's contention that these bills would have materially affected the outcome of the hearing, they did not establish that Frank no longer owed a past-due balance or that Medicaid would pay that past-due balance, and the hearing evidence affirmatively established Frank's liability.

¶ 81 As for the DHS decision dated March 30, 2018, it appears that Julia submitted that document for the first time when she filed for administrative review in the circuit court. It cannot be said that the administrative law judge unreasonably excluded a document that was not tendered. Also, despite the Estate's contention that this too would have materially affected the administrative law judge's decision, as we discussed above, the DHS decision concerned the penalty period, not the spenddown requirement, and did not undermine the hearing's outcome.

¶ 82 The Estate's last contention is that Julia should have been permitted to call the facility's two witnesses as her own, direct witnesses, because those people would already attend the hearing. The administrative law judge was not, however, required to overlook Julia's disregard for the discovery cutoff date, and Julia did engage in cross-examination. The Estate also suggests that Julia's cross-examination was unnecessarily restricted by objections from the facility's attorney and by the judge's "spontaneously" ruling without Lieberman Center's counsel first objecting. The Estate contends the judge unfairly "attempted to curtail the exploration of any evidence that might negatively impinge on [the facility's] position," and that "Frank's rights were crushed" by rulings that were "technically correct" but "fundamentally unfair."

¶ 83 The hearing transcript belies the Estate's portrayal of the hearing as fundamentally unfair. The transcript discloses that the facility's attorney raised permissible objections and was courteous during Julia's cross-examination, that the administrative law judge gave Julia some leeway as a non-attorney, and that the hearing management and evidentiary rulings were reasonable and not an abuse of discretion. The rulings did not individually or cumulatively impair Frank's right to due process.

¶ 84 For these reasons, we affirm the judgment of the circuit court which upheld the department

director's final administrative decision.

¶ 85     Affirmed.