2015 IL App (1st) 123596

FIFTH DIVISION
January 16, 2015

No. 1-12-3596

| | | |
|---|---|---|
| *In re* DEBORAH S.*, Alleged to Be a Person* | ) | |
| *Subject to Involuntary Admission* | ) | |
| (The People of The State of Illinois, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 COMH 2028 |
| | ) | |
| Deborah S., | ) | Honorable |
| | ) | Maureen Ward Kirby, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE PALMER delivered the judgment of the court, with opinion.
Justices McBride and Gordon concurred in the judgment and opinion.

## OPINION

¶ 1     Following a hearing held on July 25, 2012, the trial court found that respondent, Deborah S., was subject to involuntary commitment to Chicago Lakeshore Hospital (CLH). On appeal, respondent argues that her involuntary admission was improper because: (1) the trial court applied an improper standard in denying her request to proceed *pro se*; (2) the trial court abused its discretion in denying her request to proceed *pro se*, and (3) the evidence presented at the hearing was insufficient to support the trial court's order authorizing her involuntary admission.

¶ 2                                    I. BACKGROUND

¶ 3        On July 16, 2012, a petition seeking the involuntary admission of respondent to CLH pursuant to the provisions of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1-100 *et seq.* (West 2012)) was filed in the circuit court of Cook County. The petition alleged, *inter alia*, that respondent was unable to provide for her basic physical needs due to a mental illness and was in need of immediate hospitalization. The petition reflected that respondent was admitted to Centegra Hospital on July 15, 2012, exhibiting paranoia and irrational thinking, as well as difficulties in caring for herself. The petition listed numerous delusions and erratic behavior respondent exhibited toward staff and residents at Home of the Sparrow (HOS), a transitional facility in which she had been living. In the accompanying certificate, Dr. Scott Feldman opined that respondent was paranoid, psychotic, delusional, unable to care for herself, and in need of immediate hospitalization. A commitment hearing was held on July 25, 2012.

¶ 4        On the day of the hearing, respondent's court-appointed counsel informed the trial court that respondent wished to represent herself and requested leave to withdraw as counsel. The trial court then questioned respondent about her background, and respondent stated that she was 46 years old, was previously employed as a substitute mail carrier and as a driver for Walmart, attended approximately two years of college, and has twin sons who currently live with their father. Respondent informed the court that she was currently representing herself in her divorce proceedings, and had appeared in court approximately 15 times in that capacity, but would hire an attorney if she had the financial resources to do so. The court asked if she understood that her current court-appointed attorney had specialized knowledge and was representing her free of charge, and respondent stated that she did.

¶ 5    The court then asked respondent if she understood that she would be held to the same procedural and evidentiary rules as an attorney, and respondent stated that she did. When the trial court asked her for an example of a rule of evidence, respondent stated "papers or petitions" and "medical records." The following colloquy ensued:

"THE COURT: So let me ask you this, do you understand the ramifications of a decision to proceed *pro se*? What happens if you forgot to raise an argument that your lawyer could and that would have made the difference?

RESPONDENT: I guess that is part of not being trained.

THE COURT: That is why I am concerned.

RESPONDENT: I understand.

THE COURT: You're a bright lady. You've been able to answer my questions. I'm concerned. I'm concerned that you would not have someone who has specialized training who is very good at what she does.

RESPONDENT: Sure.

THE COURT: Who is very good at what she does and who is prepared to represent you today and zealously advocate for your rights and make sure that your constitutional liberty interest is protected. She is very good at what she does. So I haven't heard from you why you don't want her to represent you. Why don't you want her to represent you?

RESPONDENT: Well, your Honor, as I explained to her, I says [*sic*], obviously I had a right to – I was not given the right to an attorney.

THE COURT: No, no. She is your attorney.

RESPONDENT: When I brought that to her attention –

THE COURT: Just tell me what your issue is with [her].

RESPONDENT: I barely know the lady. I can't say I have no issues."

¶ 6        The court then asked respondent if she wished to represent herself, and respondent replied, "what about a public defender?" The trial court explained that her choice was to represent herself or move forward with appointed counsel. Respondent then asked if she could have an attorney from the State's Attorney's office and the court said she could not. The following colloquy ensued:

"THE COURT: So this is how it is going to go. [Appointed counsel] either represents you or you represent yourself. So the important question here is you have chosen to represent yourself, you. You have made the decision to represent yourself, is that correct?

RESPONDENT: Okay. Your honor –

THE COURT: Yes or no?

RESPONDENT: Why can I not get a public defender?

THE COURT: No. Yes or no? You have chosen to represent yourself?

RESPONDENT: Your Honor, I'm trying – like you said, I'm trying to understand. Just to make sure I do. I missed the first hearing because I was never notified of that.

THE COURT: Ma'am, this is what I'm going to do. You're not answering my question. That is the most important question to me. So I'm denying [appointed counsel's] oral motion to withdraw as counsel. I'm having [her] stay on as your attorney. She is court appointed, she is an excellent attorney. She is well

regarded by all the judges in this division. She is staying on because I'm not convinced that you would be able to represent yourself, appropriately raise an objection and appropriately follow the rules of civil procedure, the rules of evidence, and have an intricate understanding of the mental health and disabilities code."

¶ 7    The hearing commenced and the State called Pamela Hadsell, respondent's sister. Hadsell testified that in December 2010, she noticed that respondent became increasingly agitated. At that time, respondent told Hadsell that she believed that her husband was laundering money, was "doing something" in Miami, and was a spy and running guns for al-Queda. In April or May 2011, respondent was arrested in relation to a domestic dispute, after which she stayed in her father's home for several weeks and Hadsell saw her on a daily basis. During that time, respondent believed that the telephone was bugged and that she needed FBI protection, and stated that she was a porn star in Europe because her husband had sold a sex video of her. Hadsell thought respondent might have a brain tumor, given that their mother had suffered from hallucinations that were caused by a brain tumor.

¶ 8    Hadsell further testified that after respondent left their father's house, she lived at HOS. Hadsell estimated that from April 2011 to July 2012, respondent had lost approximately 25 pounds, but acknowledged that she did not appear to be malnourished. About four or five years prior, respondent told Hadsell that she is diabetic and takes medication for that condition. Hadsell did not think respondent can take care of her basic needs, but would not allow respondent to live with her upon being discharged from the hospital.

¶ 9    Dr. Scott Feldman, a board-certified psychiatrist, provided expert testimony. He testified that he has been respondent's treating psychiatrist as of July 16, 2012, when she was transferred

from Centegra Hospital to CLH. Since then he had evaluated her, as well as observed her behavior on the unit, on an almost daily basis. Dr. Feldman testified that respondent refused to speak with him unless an attorney or patient advocate is present, but acknowledged that the certificate he signed reflects that he advised her that she did not have to speak with him and that if she did speak with him, he could divulge any of that information in court. Dr. Feldman reviewed the petition and respondent's current and prior hospital records and spoke with Hadsell, respondent's husband, and HOS staff. He gained information about respondent's condition from all of those sources. He relied upon all of this information in reaching his clinical conclusion that respondent suffers from the serious mental illness of psychosis NOS, meaning psychosis not otherwise specified.

¶ 10　　　　　Dr. Feldman further testified that respondent had a history of paranoia, agitation, and delusions that people are plotting against her and stealing from her, and was currently symptomatic. Hadsell informed him about respondent's delusions regarding her husband, which started around December 2010, and also described an occasion when officers responded to a domestic dispute at respondent's home, and respondent believed that the officers were actors. Respondent's paranoid delusions include recent instances involving HOS staff and residents. For example, HOS staff reported to him that respondent was worried that people there were spying on her and plotting to take her identity, and she thought the facility's lights and smoke detectors had cameras. Two days prior to the hearing, respondent stated that she wanted to file a police report because she believed that CLH had stolen money from her. To Dr. Feldman, this indicated that respondent was beginning to incorporate him and the hospital staff into her persecutory delusions.

¶ 11    Dr. Feldman further testified that HOS staff also reported to him that respondent had poor hygiene and would routinely sit in her car for hours in extremely hot temperatures and would refuse water. Such behavior, which could lead to heat stroke, indicated to him that respondent was not thinking clearly; however, Dr. Feldman acknowledged that he did not know whether respondent's car was being cooled by air conditioning on the days in question. Hadsell recently told him that respondent has diabetes, but respondent was not allowing CLH staff to evaluate her and treat her for that condition. Lack of proper treatment for diabetes can lead to serious health issues. Respondent's hospital records reflect that she was treated for low potassium when she was admitted at Centegra Hospital, and her level was raised to "low normal" after one dose of treatment. Depending on the underlying cause for her low potassium, respondent might need daily treatment to maintain proper levels and avoid potential complications such as cardiac arrhythmia.

¶ 12    Dr. Feldman further testified that during her stay at CLH, respondent had been cooperative, had eaten regularly, was drinking sufficient fluids, and did not appear underweight. However, her hygiene was "not the best," and she had been isolative, paranoid, and delusional, and had little insight into her situation and did not appear to believe that she is mentally ill. In his opinion, respondent needed to be properly evaluated and treated for her medical and psychiatric issues as a hospital inpatient, and she would not be able to care for herself or to obtain her own shelter or medical care if she were to leave the hospital. At CLH, respondent was provided with food and prompted to eat, but that would not be the case if she were discharged, which concerned him. Dr. Feldman had considered less restrictive placement alternatives, but did not believe that they would be appropriate for respondent, and thus he was seeking a 90-day commitment order.

¶ 13　　　Respondent testified that prior to being taken to CLH she was living at HOS, a transitional facility where she did not pay rent. She was living there because her husband, who was seeking to divorce her, closed their joint bank account and took the money that was in it, as well as took her name off their joint credit cards. Respondent testified that she had access to money in the form of approximately $3,000 in tax refunds that were being held for her at an attorney's office. HOS did not provide meals, so she obtained her own food and ate three meals a day while staying there. Her belongings and car were still at HOS. When asked where she planned to live upon leaving the hospital, respondent testified that she assumed she could return to HOS, that she was never asked to leave that facility, had never caused a problem there, and that the contents of a petition that was filed by HOS staff were hearsay.

¶ 14　　　Respondent further testified that she had not been in a mental health facility prior to her admission to Centegra and CLH. She underwent two voluntary psychiatric evaluations, one in 2011 and one in 2012, and was "cleared" and deemed to not pose a danger to anyone. Upon being asked whether she would see a medical doctor upon leaving the hospital, respondent stated that she had never had a problem seeing a medical doctor and had seen emergency room doctors four times throughout 2011 and 2012 to treat a urinary tract infection. She further testified that during those visits, her blood, urine and vitals were analyzed and aside from the urinary tract infection, everything "checked out okay," and "there was no diabetes." On cross-examination, respondent testified that the home she had shared with her husband was a subject of dispute in their divorce proceedings. When asked if there were any outstanding orders that would prevent her from returning to that residence, respondent stated that "it is part of a motion." Respondent acknowledged that HOS staff cooperated in having her taken away from the facility.

¶ 15    The trial court found that the State had met its burden by clear and convincing evidence, and found that respondent was subject to involuntary admission on an inpatient basis due to her mental illness. The court entered an order admitting respondent to CLH for a period not to exceed 90 days. Respondent appeals from that order.

¶ 16                              II. ANALYSIS

¶ 17                              A. Mootness

¶ 18    Before reaching respondent's substantive arguments, we must first address the issue of mootness. In general, Illinois courts do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how the issues are decided. *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). However, our supreme court has recognized the following three mootness exceptions that may apply in certain cases: (1) the public interest exception, (2) the capable of repetition yet evading review exception, and (3) the collateral consequences exception. *Id.* at 355-62.

¶ 19    Respondent concedes that her appeal is moot because the 90-day commitment order at issue has expired. See *In re Rita P.*, 2014 IL 115798, ¶ 29. She maintains, however, that all three of the above-mentioned mootness exceptions apply in this case. The State contends that none of the mootness exceptions apply and therefore this appeal must be dismissed. For reasons discussed below, we find that the collateral consequences exception applies in this case and, accordingly, need not address whether the public interest or capable of repetition yet evading review exception is also applicable here.

¶ 20    The collateral consequences exception applies where a plaintiff has suffered or is threatened with an actual injury traceable to the defendant and likely to be redressed by a

favorable judicial decision. *In re Alfred H.H.*, 233 Ill. 2d at 361. Its application is decided on a case-by-case basis, and this exception does not automatically apply in situations where a respondent has not had prior involuntary admissions. *In re Rita P.*, 2014 IL 115798, ¶¶ 30-34.

¶ 21    Respondent maintains that the collateral consequences exception applies here because the commitment order at issue could plague her in some future proceeding relating to her mental health or to her divorce, as well as adversely affect her efforts to obtain employment or renew or retain her driver's license. The State responds that respondent has not identified any negative collateral consequences that stem from the commitment order but, rather, is merely relying upon a presumption of significant consequences flowing from the trial court's order. The State also maintains that, involuntary admission order aside, facts regarding respondent's mental health history and diagnosis by Dr. Feldman would be admissible in future proceedings as they relate to her credibility as a witness, and that her licensure rights are affected by her mental illness as opposed to the involuntary commitment order. In short, the State argues that it is respondent's mental illness diagnosis, and not her involuntary commitment, from which any collateral consequences would stem.

¶ 22    The State's position essentially leads to the conclusion that the collateral consequences exception to the mootness doctrine is inapplicable in mental health cases in general, as the original diagnosis of mental illness will always follow the respondent in question. This reasoning, however, is the same which was relied upon by the appellate court in *In re Alfred H.H.*, 379 Ill. App. 3d 1026, 1029 (2008), and which was subsequently rejected by the supreme court on appeal in that same case (*In re Alfred H.H.*, 233 Ill. 2d at 361-62). In doing so, the supreme court positively cited numerous cases in which the collateral consequences exception was found to apply in mental health cases. *Id.* at 362 (citing *In re Splett*, 143 Ill. 2d 225, 228

(1991) (applying the exception because collateral consequences related to the stigma of an involuntary admission may confront respondent in the future), *In re Hays*, 102 Ill. 2d 314, 317 (1984) (finding review appropriate because the character of an involuntary commitment has been held to be of sufficient significance to permit the invoking of the collateral consequences exception), *In re Alex T.*, 375 Ill. App. 3d 758, 763 (2007) (applying the collateral consequences exception in mental health case involving an involuntary admission order), and *In re Sciara*, 21 Ill. App. 3d 889, 895 (1974) (same)).

¶ 23　　　　Recently, in *In re Rita P.*, the supreme court reiterated that the collateral consequences exception is applicable to mental health cases and underscored that its application is decided on a case-by-case basis. *In re Rita P.*, 2014 IL 115798, ¶¶ 31-33. The court also expressly held that the collateral consequences exception did not automatically apply in cases, such as the one at bar, involving a first involuntary admission order, and that its application cannot rest upon vague unsupported statements that collateral consequences might plague the respondent in the future. *In re Rita P.*, 2014 IL 115798, ¶¶ 33-34.

¶ 24　　　　With these guiding principles in mind, we observe that here, respondent has identified numerous collateral consequences which she believes stem solely from her involuntary admission, some of which admittedly could be categorized as vague and/or unsupported. For example, respondent maintains that her involuntary admission could "plague her" in future proceedings relating to her pending divorce, but she does not offer any specifics in support of this general argument. That said, respondent also argues that the involuntary admission order will affect her ability to retain or renew her driver's license. Respondent points out that, pursuant to the Illinois Vehicle Code, although the Secretary of State would only be able to deny the renewal or retention of a person's driver's license if there is good cause to believe that person

would not be able to operate a vehicle safely due to a mental disability, such renewal or retention would not be allowed at all in cases where a person had been adjudged to be afflicted with or suffering from a mental disability. 625 ILCS 5/6-103(5), (8) (West 2012).

¶ 25    Here, the record shows that respondent was previously employed as a substitute mail carrier and as a driver for Walmart and that she is currently seeking employment. The record also shows that respondent has a car at her disposal. We are thus presented with a situation where, pursuant to the provisions of the Illinois Vehicle Code, respondent's ability to seek employment similar to that she has held in the past would be negatively impacted by the involuntary admission order in a way that differs from the impact caused solely by her mental diagnosis. 625 ILCS 5/6-103(5), (8) (West 2012). We thus find that, based on a case-by-case analysis of the particular facts and circumstances of this case, the collateral consequences exception applies here and we will address the merits of defendant's substantive arguments.

¶ 26                    B. Sufficiency of the Evidence

¶ 27    On appeal, respondent raises the following issues: (1) whether the trial court failed to comply with section 3-805 of the Mental Health Code (405 ILCS 5/3-805 (West 2012)) by applying an impermissible standard in denying her request to represent herself, (2) whether the trial court abused its discretion in denying her request to represent herself, and (3) whether the evidence presented at the commitment hearing was sufficient to support the commitment order. We note that respondent has argued these issues extensively in her brief, but that the State has failed to respond to or address them in any way in its brief. Accordingly, the State has essentially conceded these issues on appeal. *Macknin v. Macknin*, 404 Ill. App. 3d 520, 528 (2010); *Two Hundred Nine Lake Shore Drive Building Corp. v. City of Chicago*, 3 Ill. App. 3d 46, 52 (1971);

see also *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1088 (1995) (noting that an appellee who fails to address arguments in its brief should be treated as though it had not filed a brief at all).

¶ 28    Notwithstanding the State's failure to respond, our consideration of the merits of respondent's arguments reveals that the commitment order at issue must be reversed because it was not supported by clear and convincing evidence. Given our disposition on respondent's sufficiency of the evidence argument, we need not address the other two arguments she raises on appeal.

¶ 29    Respondent argues that the commitment order in this case was not supported by clear and convincing evidence that she was unable to provide for her basic physical needs. A trial court's decision to enter an involuntary commitment order will not be overturned on review unless it is against the manifest weight of the evidence. *In re Jakush*, 311 Ill. App. 3d 940, 944 (2000). A judgment is considered against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id*.

¶ 30    The State must prove the basis for involuntary commitment by clear and convincing evidence. *Id*. Here, the State's petition to involuntarily commit respondent was based on section 1-119(2) of the Mental Health Code, which provides that a person subject to involuntary admission on an inpatient basis means, *inter alia*, a person with a mental illness who, due to that illness, is unable to provide for her basic physical needs so as to guard herself from serious harm without the assistance of family or others, unless treated on an inpatient basis. 405 ILCS 5/1-119(2) (West 2012). Respondent does not contest the sufficiency of the evidence to establish that she is mentally ill.

¶ 31     Factors to be considered in determining whether respondent can provide for her basic physical needs include whether she (1) can obtain her own food, medical care, or shelter, (2) has a place to live or a family to assist her, (3) is able to function in society, and (4) has an understanding of money or a concern for it as a means of sustenance. *In re Shirley M.*, 368 Ill. App. 3d 1187, 1194 (2006).

¶ 32     Here, respondent testified that while staying at HOS, she regularly ate three meals a day. No evidence was presented to contradict that assertion. Nevertheless, Dr. Feldman testified that although respondent did not appear to be underweight and ate regularly while at CLH, he was concerned about whether she would eat regularly upon being discharged from the hospital. He provided no reason for that opinion however. The weight to be accorded to an expert's opinion depends on the factual basis for that opinion, given that the opinion's validity hinges on the reasons for it (*In re Winters*, 255 Ill. App. 3d 605, 609 (1994)), and here, Dr. Feldman's opinion regarding respondent's ability to obtain her own food does not appear to be based upon facts. Accordingly, it does not weigh in favor of involuntary commitment. *Id.*

¶ 33     The same can be said about Dr. Feldman's opinion that respondent would not be able to obtain her own medical care. In particular, Dr. Feldman expressed concern regarding potential ramifications of untreated diabetes, as well as respondent's potassium levels. However, no evidence was presented that respondent currently suffered from diabetes. Dr. Feldman testified that Hadsell informed him that respondent suffered from diabetes. In turn, Hadsell testified that approximately four or five years prior to the commitment hearing, respondent told her that she was taking medication for diabetes. However, at the commitment hearing respondent testified that throughout 2011 and 2012, she visited a doctor on four occasions in order to treat a urinary tract infection and that during those visits she underwent tests that revealed that she no longer

exhibited any signs of diabetes and that aside from the urinary tract infection, she had no medical concerns. Additionally, although Dr. Feldman testified that upon arrival at Centegra Hospital on July 15, 2012, respondent's potassium level was low, he further testified that after medical staff administered one dose of treatment, her potassium was raised to "low normal." Notably, Dr. Feldman made no mention of any documented concerns by Centegra staff about respondent exhibiting symptoms of diabetes.

¶ 34        Further, although Dr. Feldman testified that HOS staff informed him that respondent sat in her car on extremely hot days and refused water, which he believed could lead to heat stroke, he acknowledged that he did not know whether the air conditioning was on in the car during that time, and no evidence was presented regarding whether respondent seemed to be in any physical distress on those occasions. We find that the evidence presented showed that that respondent sought and obtained her own medical care while living on her own, and that no evidence was presented that at the time of her admission to CLH, respondent had low potassium levels or needed treatment for diabetes. We thus find that Dr. Feldman's opinion that respondent would be unable to obtain her own medical care upon discharge from CLH was not based on the evidence, and, as such, does not weigh in favor of involuntary commitment. *Id.*

¶ 35        Dr. Feldman also opined that he did not believe that respondent would be able to obtain her own shelter. The evidence presented does show that it is unclear where respondent would live upon discharge from CLH. Hadsell testified that respondent could not live with her, and no evidence was presented that respondent's father, who had welcomed respondent into his home in the past, would do so again. Respondent testified that she planned to return to HOS, if allowed to do so. However, as the State points out, HOS staff cooperated in having respondent removed from the facility, and thus it is questionable whether respondent would be allowed to return

there. That said, as noted in respondent's brief, not having a place to live is not reason to confine a person in a mental health facility. *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975). We also observe that it has been held that a person is free to live on the street if she chooses to do so. *In re Long*, 237 Ill. App. 3d 105, 110 (1992). Accordingly, this factor also weighs against involuntary commitment. *In re Winters*, 255 Ill. App. 3d at 610.

¶ 36 In relation to respondent's ability to function in society, Dr. Feldman testified that HOS staff reported that respondent believed that staff and residents at that facility were plotting against her. These delusions, however, were the basis for finding that respondent suffered from a mental illness, and mental illness alone is insufficient to support involuntary admission. *In re Jakush*, 311 Ill. App. 3d at 944. Doctor Feldman also testified that respondent refused to speak to him without the presence of an attorney or patient advocate, we do not find that this indicates that respondent would be unable to function in society or to care for herself. We note that Dr. Feldman acknowledged that the certificate he signed reflects that he advised respondent that she did not have to speak with him, and that if she did speak with him, he would be able to divulge that information in court. In light of this written admonishment, we do not find respondent's reluctance to speak with Dr. Feldman to be unreasonable. *In re Rovelstad*, 281 Ill. App. 3d 956, 969 (1996).

¶ 37 Additionally, although the petition reflects that HOS residents were "scared" of respondent, no evidence was presented that respondent engaged in any acts of violence or aggression against HOS staff and residents. We find that although respondent may have difficulties functioning in society due to her mental illness, little factual support was presented that she would be unable to guard herself against physical harm. *In re Tuman*, 268 Ill. App. 3d 106, 113 (1994).

¶ 38    Dr. Feldman did not provide an opinion regarding respondent's understanding of money. Respondent testified that her husband removed her name from their joint checking account and credit cards and that, due to this financial situation, she was living at HOS and representing herself in her divorce proceedings. We find that this testimony reflects that respondent understood the value of money and was taking active measures to conserve resources until her divorce proceedings were resolved. Further, although providing evidence of a "visible means of support" is not a requirement (*In re Jakush*, 311 Ill. App. 3d at 945), we note that respondent testified that approximately $3,000 in tax refunds were being held for her by an attorney, and the record reflects that she had the means by which to maintain possession of her car while she was living at HOS. Under these circumstances, we find that the respondent had an understanding of money and a concern for it as a means of sustenance, and, accordingly, this factor does not weigh in favor of involuntary commitment.

¶ 39                                    III. CONCLUSION

¶ 40    In sum, we find that the State failed to establish by clear and convincing evidence that respondent was unable to meet her basic physical needs so as to guard herself from serious harm. *Id.* at 944. We therefore find that the trial court's order of involuntary commitment was against the manifest weight of the evidence and reverse the judgment of the circuit court of Cook County.

¶ 41    Reversed.