NOTICE
Decision filed 01/08/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240820-U

NO. 5-24-0820

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* DONALD A., a Person Found Subject to Involuntary Admission and Medication | ) ) ) | Appeal from the Circuit Court of Marion County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 24-MH-39 |
| Donald A., | ) ) | Honorable Stanley M. Brandmeyer, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice McHaney and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's decisions ordering the involuntary admission of the respondent and for the administration of psychotropic medication to the respondent were not against the manifest weight of the evidence, and its findings were supported by clear and convincing evidence presented by the State. Furthermore, the record shows that both petitions and their respective hearings complied with all relevant statutory provisions. As any arguments to the contrary would lack merit, we grant the respondent's appointed counsel on appeal leave to withdraw and affirm the circuit court's judgment.

¶ 2    Respondent Donald A. appeals from an order involuntarily committing him to the Illinois Department of Human Services (IDHS) for inpatient psychiatric services and an order authorizing the administration of psychotropic medications to him in the course of his commitment. Respondent's appointed attorney in this appeal has concluded that this appeal lacks substantial

1

merit. On that basis, she has filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), along with a memorandum of law in support of that motion.

¶ 3    This court gave respondent an opportunity to file a *pro se* brief, memorandum, or other document explaining why counsel should not be allowed to withdraw, or why this appeal has merit. However, he has not taken advantage of that opportunity. This court has examined appointed counsel's *Anders* motion and the accompanying memorandum of law, as well as the entire record on appeal, and has concluded that this appeal does indeed lack merit. Accordingly, appointed counsel is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 4                                    BACKGROUND

¶ 5                                    A. Petitions Filed

¶ 6    On June 12, 2024, a petition for involuntary/judicial admission was filed requesting that respondent be involuntarily committed to a state facility for treatment. The petition was filled out by Ashlee Smith, a registered nurse, and alleged that respondent was a person with mental illness who (1) because of his illness was reasonably expected, unless treated on an inpatient basis, to engage in conduct placing him or another person in physical harm or in reasonable expectation of being physically harmed; and (2) (i) refused treatment or was not adhering adequately to prescribed treatment, (ii) because of the nature of his illness was unable to understand his need for treatment, and (iii) if not treated on an inpatient basis, was reasonably expected, based on his behavioral history, to suffer mental or emotional deterioration and, after such deterioration, to meet the aforementioned criteria. The petition further alleged that (3) respondent was in need of immediate hospitalization for the prevention of such harm.

¶ 7    The petition stated that respondent had been admitted to the intensive care unit at St. Mary's Hospital for a medication overdose, and he admitted to having overdosed on medication in the

past. He had been noncompliant with care, pulled the IV out of his arm, taken his telemetry monitor off, and refused to allow either device to be reapplied. He had refused medication and threatened to stop eating. Emily Eckols, RN, MSN; Kristi Koch, RN; and Dr. Parth Patel were listed as witnesses to those allegations.

¶ 8 A certificate of examination was attached to the petition. The petition was signed by Eckols. The notice to respondent was signed by Smith, who indicated that she provided respondent with notice of the petition on the same date that she filled out the form, June 10, 2024. The form indicated that respondent refused to sign the form; that refusal was witnessed by Madelyn Powless, a licensed practical nurse.

¶ 9 There were also two inpatient certificates attached. The first was signed by Dr. Patel, who averred that he had examined respondent and opined that respondent was a person with mental illness who met the three criteria indicated by Smith on the petition form, as previously detailed. Patel also wrote that respondent had a history of multiple suicide attempts, and was noncompliant with and refused care, including by requesting to leave the hospital on a daily basis.

¶ 10 The second inpatient certificate was signed by Dr. Alexander Seger, a psychiatrist. He also marked the aforementioned three findings on the certificate form regarding, *inter alia*, respondent's mental illness, risk of harm to himself or others, refusal of treatment and inability to understand his need for treatment, and need for immediate hospitalization. Dr. Seger wrote that he based his opinions on the facts that respondent was hospitalized after his fifth suicide attempt in the past three months,[1] that he consistently minimized his symptoms and showed no insight into

---

[1] He testified at the involuntary commitment hearing that this was respondent's fourth suicide attempt since May of 2024. It is unclear which is the correct number, but Seger and other St. Mary's staff were consistent in stating that respondent had made multiple suicide attempts in the past.

his risk of ending his life, that he was unwilling to participate in treatment, and that he was at an extremely high risk of completing suicide.

¶ 11    Dr. Seger further signed a petition for administration of psychotropic medications, which was also filed on June 12, 2024. The petition requested authority to medicate respondent due to his "ongoing, repeated, potentially fatal suicide attempts," and alleged that he "show[ed] no insight into [his] illness or need for treatment," and lacked capacity to give informed consent to taking the medication. It also included a list of medications and dosages sought to be administered, for the maximum allowed time of 90 days. Attached to the petition were forms explaining each proposed medication, including uses, contraindications, possible side effects, and other information. A handwritten note on each form indicated that copies of this information had been provided to respondent as well.

¶ 12    A predisposition report was also filed on June 12, 2024. The report included a master treatment plan, which contained admission information, treatment goals, a list of currently prescribed medications, identified risks of self-directed violence or violence directed at others, and a plan of care. Sarah Sprehe, respondent's niece and power of attorney, was consulted and indicated that she shared the concerns of respondent's psychiatrist. The options for a group home or a psychiatric nursing home had been discussed, but respondent had reportedly been unwilling to go to either. The report also included information that respondent had been discharged from St. Mary's Hospital in the past due to his minimization of symptoms, and had "bragged" to Sprehe about having been held down to be give intramuscular medications at other hospitals in the past.

¶ 13                              B. Hearing on the Petitions

¶ 14    The circuit court held a hearing on June 14, 2024. Respondent, with counsel, and Sprehe both appeared. Dr. Seger testified that he was an inpatient psychiatrist at SSM Health St. Mary's

4

Hospital in Centralia, Illinois. The State and respondent's counsel stipulated to Dr. Seger's expertise in the field of psychiatry.

¶ 15    Dr. Seger testified that he was familiar with respondent as a patient at St. Mary's, and had access to and reviewed respondent's patient records through the hospital's records system. Seger stated that he had met respondent prior to the incident at issue, and had first treated him in March of 2024, when respondent presented with suicidal thoughts. Respondent consistently denied suicidal ideation throughout the March 2024 hospitalization. Respondent refused medications at that time, so he was discharged fairly quickly.

¶ 16    He was next hospitalized at St. Mary's from April 7 to April 11, 2024, where he was treated by another inpatient psychiatrist, Dr. Martha Biduic, for a suicide attempt by cutting his wrists. Dr. Seger testified that he was not involved with respondent's treatment during that hospitalization, but he did review his patient records from that time. According to Seger, respondent was next treated at St. Mary's on April 30, 2024, after attempting the first of three known Tylenol overdoses. He was transferred to St. Louis University (SLU) Hospital, where he was treated for liver failure potentially requiring a liver transplant. After respondent stabilized medically, he was transferred to the psychiatric unit at SLU, where he remained from May 5 to May 14, 2024.

¶ 17    One day after his release from SLU, respondent again attempted to overdose on Tylenol, and presented to St. Mary's, then transferred to SLU. Dr. Seger testified that respondent's records indicate that respondent was discharged on May 20, 2024. On June 6, 2024, respondent made his third overdose attempt, and his fourth suicide attempt, over a couple of months. It was this overdose attempt that triggered the present commitment proceedings.

¶ 18    Dr. Seger testified that respondent presented to the emergency room at St. Mary's on June 6, 2024, after reportedly taking 81 Tylenol pills of an unknown dosage, causing acute liver failure.

After being moved from first the ICU and then the medical floor, respondent was admitted to the behavioral health unit on June 10, 2024. Once he arrived in that unit, respondent refused labs being drawn so that his liver function could be monitored. Respondent later agreed to have those labs drawn to make sure he was not going into liver failure.

¶ 19 During the most recent admission, Dr. Seger examined respondent and talked with him about what had precipitated his suicide attempts, how long he had suffered from suicidal thoughts, and other matters. Respondent consistently denied that his suicide attempts were suicide attempts. Instead, he claimed he took Tylenol for a headache, and told Dr. Seger that Tylenol could not kill him overnight. This continued denial indicated to Seger that respondent had no insight into his mental illness.

¶ 20 Respondent had also been resistant to treatment providers attempting to give him the Tylenol overdose antidote, telling providers that he did not want the antidote, that he was aware the providers were trying to protect his life, and that he did not want this to happen. He ultimately received the antidote, but ripped out his IV, causing blood loss and requiring security to be called. Respondent wanted to leave the hospital, and in Seger's opinion, he was actively preventing treatment. Dr. Seger advised respondent that his conduct was dangerous and, as Seger believed, intentional.

¶ 21 Dr. Seger had the same experience with respondent during a prior hospitalization three months prior, but at that time, he believed respondent had the capacity to refuse medication. Dr. Seger had reviewed notes from respondent's hospitalization at other facilities and learned that respondent had bragged that he was spitting out his medications while hospitalized in the St. Mary's psych unit, demonstrating to Seger that respondent was aware that he was refusing

6

treatment. Respondent had also been violent with staff at St. Mary's and advised Seger that he did so because he believed if he threatened hospital staff, Seger would discharge him.

¶ 22　Respondent also had a history of refusing medications. Dr. Seger read in the medical records that respondent had told a previous provider to not bother sending in prescriptions for him, as he would not pick them up; respondent had also refused medication when Seger attempted to prescribe medications. Dr. Seger believed that if respondent were medicated, he could be stabilized or his condition might even improve. He testified that improvement could be seen in as little as 90 days but was contingent on respondent's willingness to cooperate. Dr. Seger acknowledged that it was difficult to form an opinion of respondent's psychiatric diagnoses since respondent minimized his symptoms and denied that he was depressed or suicidal. Ultimately, Dr. Seger diagnosed respondent with unspecified depressive disorder.

¶ 23　Dr. Seger believed that due to respondent's mental illness and denial, he lacked capacity to make reasoned decisions about his healthcare. SLU medical records showed that Seger was not the first provider to conclude that respondent lacked that capacity. Providers at SLU had also noted that respondent had refused treatment for a prior Tylenol overdose in May of 2024. Within a reasonable degree of psychiatric certainty, Dr. Seger opined that respondent was reasonably expected to engage in conduct placing himself or others in physical harm or within reasonable expectation of being physically harmed if not treated on an inpatient basis.

¶ 24　Dr. Seger had initially considered different levels of care for respondent, such as a group home or a psychiatric nursing home, but respondent adamantly refused to consider those facilities. Since a person could only be sent to such a facility if he or she agreed, which was not an option, inpatient hospitalization was the safest option for him. As respondent had attempted suicide at least four times, and the attempts were escalating in level of risk and repeatedly damaging his liver,

Dr. Seger was concerned that respondent might be successful in his next attempt. Respondent was unable to appreciate his need to comply with treatment, and if not treated, he would continue to deteriorate. Since respondent had only attended one outpatient appointment in June of 2023, and refused all referrals made in March 2024, an immediate hospitalization would potentially prevent that harm.

¶ 25    Dr. Seger had consulted with Sprehe, respondent's niece and power of attorney, who agreed with his assessments of respondent. She told him she was afraid of him succeeding in a suicide attempt, and that she did not believe he was safe outside of a hospital setting. She had joined in Seger's advocacy to convince respondent to accept a lower level of care but was also unsuccessful.

¶ 26    On cross-examination, Dr. Seger explained that St. Mary's was not intended for long-term care, but rather to provide short-term stabilization services, including seeing whether a patient tolerated a specific medication. Substantial improvement was not expected to be seen in a short time period, as medications take time to take effect. Sending respondent to a longer-term facility at least offered a chance for him to improve, if he would comply with medications.

¶ 27    No other witnesses testified. The court found Seger's testimony to be sufficient and credible, and ruled that the State had met its burden for the entry of an order approving the petition for involuntary admission. The court then began a separate hearing on the petition to administer medication to respondent. It took judicial notice of Dr. Seger's prior testimony, then heard additional testimony from him on the issue of medication.

¶ 28    Dr. Seger requested authority to administer, in the alternative, four separate medications, along with his requested maximum daily dosages. Dr. Seger testified as to the nature, usages, known side effects, and other information regarding each medication, and opined that the potential

8

benefits of each medication to respondent outweighed the risks. Respondent had also been provided written literature describing the possible benefits and side effects of each proposed medication, but in Seger's opinion, he lacked the capacity to make reasoned decisions about treatment for his mental illnesses.

¶ 29    Along with requesting authority to administer one of these medications, Dr. Seger also sought authority to do various medical testing on respondent, for the purpose of ensuring that any medications that would be administered were safe and effective. Seger sought authority to administer the medications and perform blood test monitoring for up to 90 days. The court found that it had heard clear and convincing evidence for the entry of an order for the involuntary administration of medication. Respondent was advised to discuss his right to appeal with counsel.

¶ 30                                C. The Court's Orders

¶ 31    On June 14, 2024, following the hearing, the court entered a written order for involuntary admission. The court found that both respondent and the petitioner who initiated the petition had been present in court, and notice had been given to respondent's guardian and all relevant persons. The court found that (1) respondent was subject to involuntary admission on an inpatient basis because his mental illness was reasonably expected, unless treated on an inpatient basis, to cause respondent to engage in conduct placing himself or another in physical harm or in reasonable expectation of being physically harmed; (2) he was unable to provide for his basic needs without assistance of family, unless treated on an inpatient basis, because of his mental illness; and (3) he was refusing treatment or not adhering to prescribed treatment, and that because of his mental illness, was unable to understand his need for treatment, and if not treated on an inpatient basis, was reasonably expected to suffer mental or emotional deterioration.

¶ 32    The order granted and directed respondent to be hospitalized and treated at SSM Health St. Mary's Hospital. The facility director of the named facility was ordered to file a treatment plan with the court within 30 days of the commitment order, and respondent was to be held for no more than 90 days. Notice of procedures to appeal, procedures for extending respondent's commitment, and options for transport were attached to the order.

¶ 33    The same day, the court entered an order for administration of medication. The court again indicated that the petitioner and respondent had been present in court, and ruled that respondent had a serious mental illness and was subject to being involuntarily medicated, as he exhibited a deterioration of his ability to function as compared to the time prior to the current onset of his symptoms. The court authorized Dr. Martha Bidiuc at St. Mary's to administer to respondent any of the alternatively requested medications, in the requested dosages. Respondent was also ordered to receive the requested tests and procedures for monitoring his condition.

¶ 34    Respondent filed a timely notice of appeal from the two orders and counsel was appointed for him. Appointed counsel now moves to withdraw as counsel.

¶ 35                                      ANALYSIS

¶ 36    Appointed counsel argues that the State complied with all relevant statutory requirements in seeking the involuntary commitment for treatment of and the involuntary administration of psychotropic medication to the respondent, and that there are no meritorious arguments to the contrary. In the memorandum supporting its *Anders* motion to withdraw as counsel, appointed counsel states that it considered raising two potential issues on appeal:

> "(1) whether the State complied fully with [article VI of the Mental Health and Developmental Disabilities Code] in conducting the proceedings for involuntary admission of respondent for psychiatric treatment and authorizing the involuntary administration of medication prior to entering those orders; and

10

> (2) whether the [circuit] court's orders committing respondent for involuntary psychiatric treatment or authorizing the administration of psychotropic medication to respondent were against the manifest weight of the evidence."

¶ 37 Appointed counsel has determined that these issues would be without arguable merit, and the court's dismissal of the petition was therefore proper. As we agree with counsel's assessment, we grant appointed counsel leave to withdraw.

¶ 38                                    A. Mootness

¶ 39 Before addressing the aforementioned issues, appointed counsel addresses the issue of mootness. Counsel acknowledges that this appeal is moot because the 90-day orders entered by the circuit court have been fully satisfied, eliminating our ability to grant actual relief. See *In re Alfred H.H.*, 233 Ill. 2d 345, 350-51 (2009) (appeal was moot where the 90-day period of the commitment order had long passed); *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006). However, appointed counsel argues that an exception to mootness applies and allows us to consider this appeal.

¶ 40 As a general rule, our courts do not consider moot appeals, where no actual controversy exists or where "the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." *In re J.T.*, 221 Ill. 2d at 349-50. However, we will consider an otherwise moot case that falls under a recognized exception, such as the public interest exception, the collateral consequences exception, or the "capable of repetition, yet evading review" exception. *In re Alfred H.H.*, 233 Ill. 2d at 355-56, 358-89, 361. There is no general, *per se* exception for mental health cases—while appeals of such cases "will usually fall within one of the established exceptions to the mootness doctrine," each must be considered on its unique facts. *Id.* at 355.

¶ 41 Here, appointed counsel contends that this matter is exempt from mootness because it is capable of repetition, yet evading review. The two elements of this exception are "(1) that the

11

duration of the challenged action must be too short to be fully litigated before its end and (2) a reasonable expectation the same complainant will again be subject to the same action." *In re Julie M.*, 2021 IL 125768, ¶ 22. Regarding the first element, this appeal of involuntary commitment and medication orders could not be fully litigated before the expiry of the 90-day limit of those orders. See *id.*; *In re Craig H.*, 2022 IL 126256, ¶ 21 (finding the same). As to the second element, respondent's medical history supports a reasonable expectation that he will be subject to future emergency admissions by certification after presenting at a hospital for medical and psychiatric care. *In re Julie M.*, 2021 IL 125768, ¶ 22; *In re Craig H.*, 2022 IL 126256, ¶ 21. It is clear from the record that he has had multiple suicide attempts over a span of a few months, he does not comply with treatment, he lacks insight into the severity of his condition, and his providers anticipate that he will continue to decline without medical intervention.

¶ 42    Accordingly, we conclude that both elements of the mootness exception for issues capable of repetition yet evading review have been met in this case.

¶ 43              B. Whether the Petitions and Proceedings Complied With All
                     Relevant Provisions of the Mental Health Code

¶ 44    The first argument considered by appointed counsel broadly concerns whether all of the procedures required to have someone involuntarily committed and to authorize the administration of psychotropic medication to that person complied with the Mental Health Code.

¶ 45              i. *Whether the Involuntary Commitment Petition and Prehearing
                     Procedures Complied With All Relevant Statutory Requirements*

¶ 46    Article VI of the Mental Health and Developmental Disabilities Code (Mental Health Code, or Code) (405 ILCS 5/3-600 *et seq.* (West 2022)) governs emergency admissions by certification. As our supreme court has explained, the legislature recognized that civil commitment is a deprivation of personal liberty, and the purpose of these procedures "is to provide adequate

safeguards against unreasonable commitment." *In re Linda B.*, 2017 IL 119392, ¶ 38. Furthermore, because mental health cases involve liberty interests, strict compliance with the Mental Health Code's procedural safeguards is required. *In re Jennice L.*, 2021 IL App (1st) 200407, ¶ 16.

¶ 47    Section 3-601 of the Code addresses petitions for involuntary admission, and states in pertinent part:

> "(a) When a person is asserted to be subject to involuntary admission on an inpatient basis and in such a condition that immediate hospitalization is necessary for the protection of such person or others from physical harm, any person 18 years of age or older may present a petition to the facility director of a mental health facility in the county where the respondent resides or is present. The petition may be prepared by the facility director of the facility.

> (b) The petition shall include all of the following:

> 1. A detailed statement of the reason for the assertion that the respondent is subject to involuntary admission on an inpatient basis, including the signs and symptoms of a mental illness and a description of any acts, threats, or other behavior or pattern of behavior supporting the assertion and the time and place of their occurrence.

> 2. The name and address of the spouse, parent, guardian, substitute decision maker, if any, and close relative *** of the respondent ***. ***

> 3. The petitioner's relationship to the respondent and a statement as to whether the petitioner has legal or financial interest in the matter or is involved in litigation with the respondent. ***

> 4. The names, addresses and phone numbers of the witnesses by which the facts asserted may be proved." 405 ILCS 5/3-601(a), (b) (West 2022).

¶ 48    In the present matter, the petition requesting respondent's involuntary admission was signed by Ashlee Smith, a person over the age of 18, and that petition was presented to the facility where respondent was hospitalized, SSM Health St. Mary's Hospital in Centralia, Illinois. Across the main petition form and all attachments, the petition included details about respondent's mental health history, his latest hospitalization, and his behavior to support the position that involuntary commitment was necessary due to his mental illness. The admission record attached to the petition

13

identified Sarah Sprehe as respondent's relative, with contact information. Smith indicated on the petition form that she did not have any legal or financial interest in the matter and was not involved in litigation with respondent. Lastly, the petition listed the names and contact information of witnesses Emily Eckols, Kristi Koch, and Parth Patel. Therefore, we find that the petition complied with section 3-601.

¶ 49   Section 3-602 requires that the petition be accompanied by a certificate stating that the respondent is subject to involuntary inpatient admission and requires immediate hospitalization. *Id.* § 3-602. The certificate must be executed by a physician, psychiatrist, or other specified professional, and must indicate that this individual personally examined the respondent not more than 72 hours prior to admission. *Id.* It must also contain the examiner's "clinical observations, other factual information relied upon in reaching a diagnosis, and a statement as to whether the respondent was advised of his rights under Section 3-208." *Id.*

¶ 50   Here, an inpatient certificate executed by Dr. Patel was attached to the petition. Patel averred that he personally examined respondent at 4:30 p.m. on June 10, 2024, which was within 72 hours of respondent's admission. Patel opined that respondent was a person with a mental illness subject to involuntary inpatient admission and required immediate hospitalization. Patel also provided the facts and observations upon which he based his opinion, specifically that respondent had been noncompliant and refusing care, requested to leave the hospital on a daily basis, and had a history of multiple suicide attempts.

¶ 51   The petition also included the attached signed form of Smith, averring that within 12 hours of respondent's admission to the behavioral health unit, she provided him with copies of the petition and of the Rights of Individuals Receiving Mental Health and Developmental Services, and explained those rights to him pursuant to section 3-609. *Id.* § 3-609 ("Within 12 hours after

14

his admission, the respondent shall be given a copy of the petition and a statement as provided in Section 3-206."). We find that the petition complied with section 3-602.

¶ 52    Section 3-604 states that a respondent may not be held for more than 24 hours without a certificate being furnished. As mentioned above, the certificate was executed and shared with respondent on the same day of his admission to the behavioral health unit at St. Mary's.

¶ 53    After the certificate is completed, section 3-608 allows the facility to begin treating the respondent. *Id.* § 3-608. However, he must be informed of his right to refuse medication, and, if he does refuse, "medication shall not be given unless it is necessary to prevent the respondent from causing serious harm to himself or others." *Id.* There is no indication in the record that respondent received medication following the completion of the petition, and thus the process was compliant with this section as well.

¶ 54    Section 3-609 includes, as mentioned above, that a copy of the petition shall be provided to the respondent within 12 hours of his admission. *Id.* § 3-609. Smith signed a form attached to the petition indicating compliance with this requirement. This section also states that the respondent must be notified of the name and address of the Guardianship and Advocacy Commission pursuant to section 3-206 of the Code (*id.* § 3-206), also within 12 hours of admission. *Id.* § 3-609. Smith signed another attached form that included this information and averred that she provided a copy to respondent on June 10, 2024, at 6:41 p.m. The form indicates that respondent refused to sign to confirm receipt; Madelyn Powless signed the form as a witness to respondent's refusal.

¶ 55    Section 3-610 requires a psychiatrist, other than the examiner who executed the certificate discussed above, to personally examine the respondent within 24 hours of his admission. *Id.* § 3-610. Dr. Seger executed the second attached inpatient certificate, averring that he had personally

examined respondent on June 11, 2024. Seger opined that respondent met the requirements for involuntary admission. The second certificate must also be promptly filed with the court. *Id.* This was also satisfied, as it was filed as part of the package presented to the court on June 11, 2024.

¶ 56 Section 3-611 requires the filing of two copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court within 24 hours of the respondent's admission. *Id.* § 3-611. The court must then set a hearing date within five business days of receiving the petition. *Id.* The package containing the petition and all above-mentioned attachments was filed the day after respondent's admission, satisfying the first part of this section. The court set a hearing date of June 14, 2024, and the hearing took place on the scheduled date, three days after the petition was filed.

¶ 57 Therefore, we conclude that the request to have respondent involuntarily committed complied with article VI of the Mental Health Code.

¶ 58         ii. *Whether the Court Conducted the Involuntary Commitment*
             *Hearing in Compliance With All Relevant Statutory Requirements*

¶ 59 Having determined that all prehearing procedures were complied with, we turn next to the hearing on the petition. Article VIII of the Mental Health Code governs the proceedings for involuntary admission. The State must prove its basis for involuntary commitment by clear and convincing evidence. *Id.* § 3-808; *In re Lance H.*, 2014 IL 114899, ¶ 23. We will review the strength of the evidence presented in a later section, turning now to whether the court complied with all relevant provisions of article VIII in conducting the involuntary commitment hearing and rendering its decision.

¶ 60 Section 3-805 of the Code requires that every respondent subject to involuntary inpatient admission shall be represented by counsel, and if indigent, counsel must be appointed to him. 405 ILCS 5/3-805 (West 2022). The circuit court's initial order setting the hearing date included the

16

appointment of counsel. Respondent also personally appeared at the hearing, satisfying the requirement of section 3-806 that a respondent shall be present at all hearings, barring certain circumstances. *Id.* § 3-806.

¶ 61    Section 3-807, requiring at least one qualified individual who has examined the respondent to testify in person at the hearing, was satisfied through the testimony of Dr. Seger, the psychiatrist who examined respondent and executed the second inpatient certificate. *Id.* § 3-807. Because the court found that respondent was subject to involuntary inpatient admission, section 3-809 required it to enter an order to that effect, which the court did on June 14, 2024. *Id.* § 3-809.

¶ 62    After finding that respondent was subject to involuntary admission, the circuit court was tasked with determining the appropriate disposition for him. In making that determination, the court was required to consider St. Mary's final report, filed on June 12, 2024, pursuant to section 3-810. *Id.* § 3-810. This section states that the final report shall include "information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order." *Id.* The treatment plan must "describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment." *Id.* The report that was filed addressed each of these points. The hearing transcript and court's final order show that the court considered the report in rendering its decision regarding both involuntary inpatient admission and the appropriate disposition for respondent.

¶ 63    The court was also required to consider whether any alternative mental health facilities might be appropriate for and available to respondent, short of involuntary inpatient admission. *Id.* § 3-811(a). At the hearing, the court heard Seger's testimony about the alternative treatment options that were considered for respondent, including a psychiatric nursing home and a group

17

home. Seger testified that these facilities are only available to those who agree to be treated there, and respondent had refused them. Seger concluded that the only remaining option to keep respondent safe from further harm and deterioration of his mental health was inpatient hospitalization.

¶ 64    The circuit court complied with section 3-811 in stating that it had considered the sworn testimony and found it sufficient and credible to support the entry of an order approving the petition for an involuntary admission. *Id.* The court further complied with section 3-813(a) by limiting the term of commitment to 90 days. *Id.* § 3-813(a).

¶ 65    Thus, we find that the circuit court complied with all applicable sections of the Mental Health Code in conducting the involuntary commitment hearing and in the entry of its order.

¶ 66            iii. *Whether the Petition and Related Proceedings to Administer*
                *Medication Complied With Relevant Statutory Requirements*

¶ 67    The State's second petition requested the authority to administer certain specific medications to respondent during his hospitalization. The administration of psychotropic medications is governed by section 2-107.1 of the Code. *Id.* § 2-107.1. According to this section, a petition to the court requesting to administer medication to a respondent without their informed consent must include a statement that the petitioner has made a good-faith effort to determine whether the respondent has executed a power of attorney for health care; if the respondent has executed such a document, a copy must be attached to the petition. *Id.* § 2-107.1(a-5)(1). Dr. Seger signed a statement declaring that he made a good-faith effort to determine if any such arrangement was in place, and that if any such documents were found, they would be attached.

¶ 68    This section also requires that the petition include the specific testing and procedures, if any, that the petitioner requested as "essential for the safe and effective administration of the psychotropic medication" sought to be administered. *Id.* Seger explained to the court what testing

18

was required to monitor respondent's tolerance and response to the medications sought. The court authorized the necessary monitoring procedures in its order.

¶ 69   Section 2-107.1(a-5)(2) requires that a hearing be held within seven days of the filing of the petition. *Id.* § 2-107.1(a-5)(2). This section further instructs that "[t]he hearing shall be separate from a judicial proceeding held to determine whether a person is subject to involuntary admission but may be heard immediately preceding or following such a judicial proceeding and may be heard by the same trier of fact or law as in that judicial proceeding." *Id.* Here, the hearing took place within three days of the petition's filing and took place immediately following but separate from the hearing on the petition for involuntary admission, by the same judge.

¶ 70   Section 2-107.1(a-5)(4) states that psychotropic medications may only be administered if the court has found that all of the factors listed in this section have been established by clear and convincing evidence. *Id.* § 2-107.1(a-5)(4). While we will review the specific factors and evidence presented in a later section, we note now that the hearing transcript shows that the court heard detailed testimony from Dr. Seger that sufficiently established that respondent had a serious mental illness causing the deterioration of his ability to function, that he lacked the capacity to make reasoned decisions regarding treatment, that less-restrictive measures were found to be inappropriate, and that the benefits of the treatment outweighed the risk of harm.

¶ 71   The court also complied with section 2-107.1(a-5)(5) by limiting the authority to administer medications to 90 days. *Id.* § 2-107-1(a-5)(5). As per section 2-107.1(a-5)(6), the court's order also designated Dr. Martha Bidiuc or a member of the clinical staff at St. Mary's as the people authorized to administer the identified treatment. *Id.* § 3-107.1(a-5)(6). The order further listed the four specific medications that were authorized, as well as their anticipated dosage ranges. *Id.* ("The order shall also specify the medications and the anticipated range of dosages that have been

19

authorized and may include a list of any alternative medications and range of dosages deemed necessary.").

¶ 72　Therefore, we find that the petition and related proceedings regarding the administration of psychotropic medication to respondent complied with all relevant provisions of the Mental Health Code, and any arguments to the contrary would be without merit.

¶ 73　C. Whether the Court's Orders Were Against the Manifest Weight of the Evidence

¶ 74　In reviewing the entry of an involuntary commitment order or an order authorizing the involuntary administration of psychotropic medication, we will not reverse the circuit court's decision unless it was against the manifest weight of the evidence. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 29; *In re Maureen D.*, 2015 IL App (1st) 141517, ¶ 26. A decision is against the manifest weight of the evidence only where the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 29. Under this standard, we defer to the circuit court's determinations regarding witness credibility and the weight to be given to the evidence, and we will not substitute our judgment for the court's on these findings. *In re Rob W.*, 2021 IL App (1st) 200149, ¶ 78.

¶ 75　　　　　　　　　　i. *The Order for Involuntary Admission*

¶ 76　In order for a person to be involuntarily admitted on an inpatient basis, the circuit court must find that he or she has a mental illness and meets one of three criteria. 405 ILCS 5/1-119 (West 2022); *In re Lance H.*, 2014 IL 114899, ¶ 21. The first two are that, because of this mental illness, the individual (1) "is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another in physical harm or in reasonable expectation of being physically harmed"; or (2) "is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or others, unless treated on

20

an inpatient basis." 405 ILCS 5/1-119(1), (2) (West 2022); see also *In re Lance H.*, 2014 IL 114899, ¶ 21.

¶ 77 The third criterium is that the person has a mental illness and "(i) refuses treatment or is not adhering adequately to prescribed treatment; (ii) because of the nature of his or her illness, is unable to understand his or her need for treatment; and (iii) if not treated on an inpatient basis, is reasonably expected, based on his or her behavioral history, to suffer mental or emotional deterioration and is reasonably expected, after such deterioration," to meet either of the first two criteria. 405 ILCS 5/1-119(3) (West 2022); see also *In re Lance H.*, 2014 IL 114899, ¶ 21. Section 1-119 also provides that, in making the determination that the respondent meets any of these criteria, the court "may consider evidence of the person's repeated past pattern of specific behavior and actions related to the person's illness." 405 ILCS 5/1-119 (West 2022).

¶ 78 The petition and attachments filed with the court also contained opinions and observations from St. Mary's clinical staff regarding respondent's suicide attempts, noncompliance with medication and refusal of treatment, risk of harm to himself or others, and inability to understand his need for treatment. As previously summarized, the petition package was supported by Dr. Seger's testimony at the involuntary commitment hearing.

¶ 79 Dr. Seger provided testimony based on his personal examination of respondent, his prior involvement in respondent's treatment, and his review of respondent's medical records. He testified that respondent had a history of suicide attempts and mental-health-related hospitalizations, including four attempts over the past three months. He also explained respondent's history of refusing treatment, minimizing his symptoms, and lack of insight into his condition. According to Seger, respondent's concerning behaviors included denying being suicidal despite numerous suicide attempts, ripping out his IV, attempting to leave the hospital, bragging

21

about his noncompliance with medications, and spitting out medications. Respondent also told Seger that Tylenol could not kill him overnight, despite his multiple hospitalizations for Tylenol overdoses.

¶ 80    Dr. Seger diagnosed respondent with unspecified depressive disorder and opined that respondent lacked capacity to make reasoned decisions about his healthcare or appreciate the need to comply with treatment. He also informed the court that respondent had undergone a psychiatric consult at SLU in May of 2024, where he was also found to lack capacity to refuse or consent to treatment. Seger opined, within a reasonable degree of psychiatric certainty, that respondent was expected to engage in conduct that would cause harm or reasonable expectation of harm to himself or others, unless he received inpatient treatment.

¶ 81    Dr. Seger also testified to the efforts made to find a less restrictive placement for respondent and explained to the court that inpatient hospitalization was necessary given that respondent had refused all other options. Seger further opined that only inpatient hospitalization could keep him safe and prevent him from continuing to deteriorate. Seger was significantly concerned that, left untreated, respondent would succeed in ending his life. However, if he were medicated during as little as a 90-day hospitalization, Dr. Seger believed that respondent could be stabilized, or his condition could improve. Seger believed that receiving treatment during this time might allow respondent to gain some insight into his condition and decrease his short-term risk of harm.

¶ 82    The circuit court found that the testimony established by clear and convincing evidence that respondent a person with mental illness who (1) because of his illness, is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing him or another person in physical harm or in reasonable expectation of being physically harmed; (2) because of his illness, is unable to provide for his basic physical needs to guard against serious harm without assistance, unless

22

treated on an inpatient basis; and (3) (i) refuses treatment or is not adhering adequately to prescribed treatment, (ii) because of the nature of his illness is unable to understand his or her need for treatment, and (iii) if not treated on an inpatient basis, is reasonably expected based on his behavioral history, to suffer mental or emotional deterioration and is reasonably expected, after such deterioration, to meet the criteria of either (1) or (2).

¶ 83 We defer to the circuit court on its determination regarding the credibility of Dr. Seger's testimony. We find that the court's findings were reasonable based on the evidence presented, and conclude that its decision was not against the manifest weight of the evidence.

¶ 84 ii. *The Order for the Administration of Involuntary Treatment*

¶ 85 Applying the same standard as above, we turn to the court's order granting the petition to administer medication. As we referred to previously section 2-107.1(a-5)(4) of the Mental Health Code provides that psychotropic medication may be administered "if and only if it has been determined by clear and convincing evidence" that each of the listed factors are present. 405 ILCS 5/2-107.1(a-5)(4) (West 2022). These factors are:

> "(A) That the recipient has a serious mental illness or developmental disability.
>
> (B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.
>
> (C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.
>
> (D) That the benefits of the treatment outweigh the harm.
>
> (E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

23

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." *Id.*

¶ 86 The court previously found that clear and convincing evidence existed to establish that respondent had a mental illness, warranting involuntary commitment. Dr. Seger testified to respondent's history of refusing treatment, as we summarized in the previous section. Seger also testified to respondent's failure to follow up with recommended outpatient treatment in the past, attending only one outpatient visit in the past year and not consenting to medication management and psychotherapy after his discharge from the behavioral health unit. Seger concluded that there was no lower level of treatment that would maintain respondent's safety. Dr. Seger further opined that respondent lacked capacity to make reasoned decisions about his treatment, based on his denial and minimization of his condition.

¶ 87 Seger concluded that respondent lacked insight into the severity of his condition, his risk of harm, and his need for treatment. Seger also explained that he expected respondent's ability to function to deteriorate if he continued refusing treatment and would likely lead to respondent's death by suicide. Seger stated that respondent's condition had existed for several months, based on Seger's own experience with respondent and his review of the patient records, and that respondent's suicide attempts were increasing in frequency.

¶ 88 Dr. Seger also testified to the nature, uses, known side effects, and other information regarding each medication listed in the petition, and opined that the potential benefits of each medication to respondent outweighed the risks. He explained that he chose these medications over other options that carried a higher risk of harm. The petition indicates that respondent was provided with a copy of the information on each medication as well. Seger also confirmed to the court that

24

respondent had been advised of the benefits, side effects, and risks of each proposed medication. Seger further explained that he believed blood testing was necessary to monitor respondent's tolerance and response to the medications, and that the only risk of a blood draw was a localized injection.

¶ 89    Where an expert fails to support his opinion with specific facts or testimony as to the basis of those opinions, "then his testimony alone is insufficient to satisfy the clear and convincing evidence standard." *In re Harlin H.*, 2022 IL App (5th) 190108, ¶ 76 (finding that psychiatrist's testimony did not rise to the level of clear and convincing where he did not adequately explain the bases for his opinion and the opinion was unsupported by the evidence). In *In re Harlin*, the respondent's treating psychiatrist did not testify on the benefits and side effects of any individual medication sought to be administered, stating only that the benefits outweighed the harms. *Id.* ¶ 70. He also did not explain how each medication would be administered, or the dosages associated with each. *Id.* The petition also failed to indicate whether the listed medications would be sought individually or in combination, and the psychiatrist did not clarify this in his testimony. *Id.* ¶ 73. The petition and attachments also failed to show that the respondent was provided with information about all of the medications listed, and nothing in the record showed how each medication would treat his diagnosed bipolar disorder or any of his specific symptoms. *Id.* ¶ 75.

¶ 90    By contrast, the petition and attachments in the present matter, as well as the transcript of Dr. Seger's testimony from the hearing to administer involuntary treatment, show that none of these defects existed here. The court was presented with information about each specific medication, the maximum proposed dosage, how and why the medication would be used, why Seger believed that its benefits would outweigh the harm for respondent, and why these

medications were chosen over other options. The record also shows that respondent was provided with full information about each proposed medication as well.

¶ 91　Therefore, we find that clear and convincing evidence existed to support the court's order authorizing the administration of the specific medications requested, for a period of up to 90 days. We further find that the court's decision was not against the manifest weight of the evidence, and that any arguments to the contrary would lack merit.

¶ 92　　　　　　　　　　　　　CONCLUSION

¶ 93　As this appeal presents no issue of arguable merit, we grant appointed counsel leave to withdraw and affirm the circuit court's judgment.

¶ 94　Motion granted; judgment affirmed.